FOURTH DIVISION
January 11, 2007

No. 1-06-0086

| | | |
|---|---|---|
| TIMOTHY JOYCE, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| JAY J. MASTRI, JAY'S HVAC, INC., an | ) | |
| Illinois Corporation, and MADISON SERVICES, INC., | ) | |
| a Mississippi Corporation, | ) | Honorable |
| | ) | Cheryl A. Starks, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Plaintiff, Timothy Joyce, an employee of an independent contractor, suffered injuries when he fell off a ladder at a construction site. Plaintiff filed a complaint at law with two counts against defendant, Madison Services, Inc. (Madison Services), the general contractor of the site, alleging common-law negligence. Plaintiff appeals from orders of the circuit court granting summary judgment in defendant's favor.[1] Plaintiff contends that defendant had a duty to prevent his injuries in light of its contract with plaintiff's employer, its retention of control over certain aspects of the construction site, its contract with the federal government and nondelegable duty to comply with applicable safety regulations, and as the possessor of the land where his injury occurred. For the following reasons, we affirm.

---

[1] Defendants Jay J. Mastri and Jay's HVAC, Inc. are not parties in this appeal.

## I. Background

Plaintiff's injuries occurred on April 16, 2001, at a construction site at the United States Army Reserve Base in Arlington Heights, Illinois. Madison Services acted as the general contractor at the construction project to demolish and install air handling systems. Madison Services hired plaintiff's employer, Elk Grove Mechanical, Inc. (EGM), to perform certain demolition and construction work at the site. EGM contracted to work on demolishing air handling units and their appurtenances in mechanical rooms 110 and 115 at the site.

Pursuant to section 8.1 of the contract between Madison Services and EGM, EGM was required to execute the work contracted for and provide "all labor, materials, equipment, services and other items required to complete such portion of the Work." Section 3.2.2 of the contract provided that Madison Services "shall not give instructions or orders directly to employees or workmen of [EGM], except to persons designated as authorized representatives of [EGM]." Under section 2.1, Madison Services and EGM agreed to be "mutually bound by the terms of [the] Agreement and, to the extent that provisions of the Prime Contract apply to the Work of the Subcontractor, the Contractor apply to the Work of the Subcontractor all obligations and responsibilities that the Owner, under the Prime Contractor assumes toward the Owner and the Architect." Also, under section 4.3.1, EGM agreed that it "shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures, initiated by [Madison Services] and with applicable laws, ordinances, rules, regulations and orders of public authorities for the requirements of the Prime Contract [between Madison Services and the United States Government]. [EGM] shall report within three days an injury to

an employee or agent of [EGM] which occurred at the site."

Additionally, section 4.4.1 of the contract provided that "[EGM] shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Subcontract. [EGM] shall not be held responsible for unclean conditions caused by other contractors and subcontractors." Section 4.6.1 provided:

"To the fullest extent permitted by law, [EGM] shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or under this Subcontract, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of [EGM], [EGM's] Sub-subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder."

Plaintiff testified at his deposition that on April 16, 2001, he arrived at the work site on the Army Reserve Base at approximately 8 a.m. Plaintiff testified that after first arriving at the work site, he set up extension cords to plug in saws and swept the larger mechanical room. At approximately 9:20 a.m., plaintiff testified that he began setting up in the smaller mechanical

room where he was injured. Plaintiff testified that his employer, EGM, was contracted to tear out several 15-ton air handlers at the time. Plaintiff was attempting to remove duct work at the time of his fall.

Plaintiff testified that in order to set up for the removal of duct work, he used a ladder that was brought to the work site by defendant Jay Mastri, from Jay's HVAC. Plaintiff testified that he set up the ladder near the west wall of the mechanical room and extended it to approximately 15 feet. Plaintiff testified that the feet of the ladder were four feet from the wall. Plaintiff testified that when he climbed about 10 to 12 feet up the ladder to begin working, the ladder started to retract back to its normal position. Plaintiff testified that he heard part of the locking mechanism flapping against the rungs of the ladder as it retracted. Plaintiff testified that the noise sounded like "tick, tick, tick, tick" that one would hear when the locking mechanism on a ladder is unlatched and the ladder is retracting. Plaintiff testified that he held on to the ladder and rode the ladder down. Plaintiff testified that when he neared the bottom of the ladder, his wrist became caught in the rungs and his wrist was shattered. Plaintiff testified that he then fell to the ground. Plaintiff testified that in his opinion the ladder retracted because there was a problem with the locking mechanism.

Plaintiff testified that no one told him to use the particular ladder in question. Plaintiff testified that the ladder was available, so he picked it up and began using it. Plaintiff testified that Rich Olson was his supervisor at EGM, and that he only saw Olson once to go over things. Plaintiff testified that Jay Mastri, of Jay's HVAC, was his day-to-day supervisor, who then reported to Rich Olson. Plaintiff testified that he had no contact with any employee or anyone

related to Madison Services. Plaintiff testified that Madison Services did not provide any of the equipment for the work project.

Michael Reinersman testified at his deposition that he was employed by Madison Services, as a project or site manager, at the time of plaintiff's injury. In April 2001, Reinersman was responsible for overseeing Madison Services' projects in the Midwestern region, which included six states and between 20 to 25 jobs. Reinersman was the only Madison Services employee performing that job in the Midwestern region, at the time of plaintiff's injury. Reinersman testified that his responsibilities were to bid a job out to subcontractors, make recommendations to Madison Services, and define the scope of the job to the government and the subcontractor. Reinersman testified that he was responsible for learning what the government wanted done at its facility and then passing that scope on to the subcontractor. Reinersman testified that on the work site in question and in all the projects it did, Madison Services had no self-performed work because it had no tradesmen. Reinersman explained that since Madison Services' contracts were written as prime contracts for the government, it viewed them as more of a contract management point, wherein Madison Services handled the paperwork between the government and the subcontractors.

Reinersman testified that he visited the work site, during the course of EGM's work, approximately five times. Reinersman testified that he was present on at least one occasion when EGM was performing its work. Reinersman testified that none of the work he observed was being performed in an unsafe manner, or in violation of OSHA standards. Reinersman testified that Madison Services had the right to stop a subcontractor's work at the Army Reserve Base if

there was some type of safety hazard, but Reinersman did not have any occasion where he had to exercise that right. Reinersman testified that he was not present on the day of plaintiff's injury and did not conduct a postaccident investigation. Reinersman testified that he was not aware of plaintiff's injury until December 2002. Reinersman testified that during a preconstruction meeting, the issue of dust protection was raised to protect the rest of the facility during EGM's demolition work. Reinersman testified that EGM put in place dust protection procedures.

Reinersman testified that Madison Services' prime contract with the government did not call for daily site supervision and Madison Services had no role in enforcing safety rules on the work site. Madison Services did not have a safety person assigned to the work site at the Army Reserve Base. Reinersman testified that subcontractors, such as EGM, were to comply with OSHA, based on their contract with Madison Services. Subcontractors were made aware that they were responsible for safety when they contracted with Madison Services.

Reinersman also testified that he never instructed EGM employees as to what tools to use or how to go about doing their work. Reinersman testified that Madison Services did not provide any equipment to be used on the work site, did not direct EGM employees as to the operative details as to how to perform their work, and did not give any job assignments to EGM employees.

Richard Olson testified that he was employed as superintendent for EGM at the time of plaintiff's injury. Olson testified that he was responsible from the start to the finish of a job, that he ran everything, and that nothing happened unless it went through him. Olson testified that he was responsible for 60% to 70% of EGM's bidding, reviewed and signed contracts, hired and

fired employees, did job walk-throughs, and took care of the punch list. Olson testified that he was responsible for holding safety meetings at EGM's shop, overseeing the repair of broken ladders and tools, and providing workers with safety glasses and hard hats. Olson testified that at safety meetings, ladders would be checked to make sure they had a sound structural base. Olson testified that EGM inspects its ladders, the locking mechanisms on the ladders, and the ropes on the ladders.

Olson testified that his contact with Madison Services was Michael Reinersman, who was the project manager for Madison Services. Olson testified that EGM's scope of work with Madison Services involved EGM removing air-handling units at the Army Reserve Base. Olson testified that Reinersman was the only individual from Madison Services to visit the work site, and that Reinersman visited the work site about every three days or every other day. Olson testified that when Reinersman was at the work site, no safety issues came up and no safety meetings were conducted with Reinersman present. Olson testified that Reinersman did not express the manner in which he wanted EGM employees to perform work. Olson testified that Madison Services did not provide any of the equipment, but provided the scope of work for the project. Olson testified that EGM had a lead man on the work site who supervised the work, made sure that EGM employees worked eight hours and monitored job progress. Olson testified that if Adam Blau and Jerry Johansen were at the work site, Jerry Johansen had more experience and would have been EGM's lead man. Olson testified that Madison Services did not supervise EGM's work and that EGM workers would go to him if they had any type of problems. Olson testified that EGM workers would have no reason to go to Reinersman.

Olson also testified that Jay Mastri, of Jay's HVAC, was at the work site and was a subcontractor of EGM. Olson testified that Mastri performed the same work as EGM and also reported to him. Olson testified that plaintiff's coworkers stated that plaintiff had the ladder at a bad angle and that the ladder was backwards. Olson testified that he had no other information as to what may have caused plaintiff to fall. Olson indicated that the floor was dry and that he did not see any skid marks on the floor after plaintiff's injury.

Jay Mastri testified that his company, Jay's HVAC, had subcontracted with EGM on various jobs for about one year prior to working at the Army Reserve Base. Mastri testified that he did not have a written contract with EGM to work on the demolition project at the Army Reserve Base, but just filled in when needed. Mastri testified that he performed work, then billed EGM for his time worked at the Army Reserve Base.

Mastri testified that he met with Reinersman from Madison Services and Olson to discuss the scope of work prior to the project. Mastri testified that he did not see anyone else from Madison Services visit the work site. Mastri testified that he began working on the work site three weeks prior to plaintiff's injury. Mastri testified that the room had cinderblock walls and a poured concrete floor that was painted. Mastri testified that he did not know how long plaintiff was on the ladder prior to his fall and that he did not see plaintiff fall. Mastri testified that the room was almost done with demolition and almost empty at the time of plaintiff's injury. He indicated that there was nothing on the ground that would have caused a problem for the ladder itself gripping the ground, and that there were no foreign substances or broken concrete on the floor. Mastri testified that there was "maybe just dust" on the floor but that plaintiff could have

swept the floor.

Mastri testified that Jerry Johansen was the lead man for EGM, but all of the workers knew what to do on the work site. Mastri testified that no one from Madison Services came to the work site to supervise EGM and Jay's HVAC workers. Mastri also testified that he spoke with plaintiff after plaintiff's injury, and plaintiff complained that the ladder was missing a rope and caused his fall.

Adam Blau testified that he worked as an EGM employee on and off the Army Reserve Base project prior to the time of plaintiff's accident. Blau testified that Olson was the foreman for EGM and ran the job. Blau testified that he received his instructions from Olson and everyone else also took their instructions from Olson. Blau testified that if Olson was not at the work site, Jerry Johansen was in charge. Blau testified that he had no discussions with Reinersman from Madison Services about how work should be done. Reinersman only told Blau to "be careful." Blau testified that he never had any specific conversations with Reinersman about safety or equipment at the work site. Blau also testified that when Reinersman was at the work site, he did not tell Blau how to do his demolition work and Madison Services did not provide any of the equipment that Blau used on the work site.

Blau testified that he did not see plaintiff fall from the ladder. Blau indicated that the floor in the mechanical room was a regular concrete floor and that it was smooth. Blau testified that there was dust on the floor at the work site. Blau testified that he had no information as to what caused plaintiff to fall from the ladder.

Scott Curatti testified that he was the owner of EGM at the time of plaintiff's injury.

Curatti testified that plaintiff was an EGM employee on the date of his injury. Curatti testified that Olson ran the job for EGM and that Olson sold the job, set it up, ran the workers, and told them what to do. Curatti testified that Olson hired Jay's HVAC to help on the work site. Curatti testified that Olson had the skill to conduct the work on the Army Reserve Base. Curatti would expect Olson to work safely on the project and see that EGM employees also worked safely. Curatti had no information that Madison Services directed any of EGM's work.

John Lange testified that he is president of Madison Services and that Reinersman was the project manager for Madison Services at the time of plaintiff's injury. Lange testified that Reinersman ran between 15 to 20 jobs in multiple states. As project manager, Reinersman would coordinate with the government, oversee branch operations and have overall responsibility for the coordination of work, inspection and invoicing all delivery orders. Lange testified that he was never at the Army Reserve Base project.

Lange testified that Madison Services' personnel did not perform work on the project in question. Lange testified that the work would be contracted out to various subcontractors and then supervised by the subcontractor's managers. Lange testified that Reinersman's primary responsibility was to meet with the government personnel, who would issue delivery orders and ensure that the scope of the delivery order was understood by Madison Services and Madison Services' subcontractors. Reinersman would then issue a subcontract and report back to the government and Madison regarding the status of the job. Reinersman would ascertain the status of the job by phone and occasional visits to the site and visits with government officials. Lange testified that Reinersman had no supervisory relationship with any of the people performing

demolition work at the Army Reserve Base and Reinersman was the only Madison Services' employee at the work site.

On March 24, 2005, plaintiff filed his third-amended complaint at law, including two counts against Madison Services. Count II of the complaint, entitled "Duty under Prime Contract/OSHA," alleged that Madison Services owed plaintiff a duty of care based on its retention of control at the work site under section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts §414 (1965)); and count III, entitled "Premises Liability," alleged that Madison Services owed plaintiff a duty of care as possessor of the land under section 343 of the Restatement (Second) of Torts. On December 29, 2004, the circuit court granted partial summary judgment in Madison Services' favor and dismissed count II, finding that Madison Services did not owe plaintiff a duty of care under section 414 of the Restatement (Second) of Torts. On December 30, 2005, the circuit court denied plaintiff's motion to reconsider and granted summary judgment in favor of Madison Services and dismissed count III, finding that plaintiff could not sustain its premises liability claim under section 343 of the Restatement (Second) of Torts. Plaintiff appeals the summary dismissal of counts II and III.

## II. Analysis

In a negligence action, a plaintiff must present sufficient evidence to establish that the defendant owed a duty to the plaintiff. Downs v. Steel & Craft Builders, Inc., 358 Ill. App. 3d 201, 204 (2005). The existence of a duty is a question of law to be decided by the court; if no duty exists there is no recovery. Downs, 358 Ill. App. 3d at 204. Summary judgment is

appropriate where the pleadings, depositions, admissions and affidavits on file, viewed in the light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Cochran v. George Sollitt Construction Co., 358 Ill. App. 3d 865, 872 (2005). This court reviews the grant of summary judgment de novo. Cochran, 358 Ill. App. 3d at 872.

Plaintiff presents three bases for the existence of a duty of care: (1) Madison Services' contractual right to control and actual retention of control under section 414 of the Restatement (Second) of Torts; (2) Madison Services' responsibility under its prime contract with the government and applicable safety regulations; and (3) Madison Services' status as possessor of the land under section 343 of the Restatement (Second) of Torts. We will address each of these bases in turn.

A. Section 414 of the Restatement (Second) of Torts

Plaintiff first contends that Madison Services owed him a duty of care pursuant to section 414 of the Restatement (Second) of Torts, because Madison Services retained contractual and actual control over EGM's employees at the work site.

Generally, one who employs an independent contractor is not liable for the latter's acts or omissions. Downs, 358 Ill. App. 3d at 204-05. In Illinois, a recognized exception to this rule is found in section 414 of the Restatement (Second) of Torts, which provides:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose

safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts §414 (1965).

Comment c to section 414 explains the "retained control exception":

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts §414, Comment c, at 388 (1965).

Whether a contractor retained such control over a subcontractor's work so as to give rise to liability is an issue reserved for a trier of fact, unless the evidence presented is insufficient to create a factual questions. Bokodi v. Foster Wheeler Robbins, Inc., 312 Ill. App. 3d 1051, 1059 (2000). The best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists. The interpretation of a contract is a question of law and therefore may be decided on a motion for summary judgment. Downs, 358 Ill. App. 3d at 205. When interpreting a contract, we must consider the entire document to give effect to the

parties' intent, as determined by the plain and ordinary meaning of the language of the contract. Downs, 358 Ill. App. 3d at 205. We find that the contract between Madison Services and EGM did not evidence an intent by Madison Services to retain control over safety at the construction site, which would give rise to a duty of care owed by Madison Services to plaintiff.

Generally, in a construction negligence case involving a contract between a defendant general contractor and an independent contractor that employed the plaintiff, summary judgment is improperly granted to a general contractor that had agreed to retain control over safety at a construction site (Downs, 358 Ill. App. 3d at 205-06, citing Moorehead v. Mustang Construction Co., 354 Ill. App. 3d 456, 461 (2004) (where general contractor had agreed to be " 'fully and solely responsible for the jobsite safety' "), or where a general contractor goes to great lengths to control safety at the construction site (Bokodi, 312 Ill. App. 3d at 1063-64). However, summary judgment in favor of the general contractor is appropriate where an independent contractor is contractually responsible for jobsite safety and the defendant general contractor takes no active role in ensuring safety (Fris v. Personal Products Co., 255 Ill. App. 3d 916, 924-25 (1994)) (defendant retained authority to stop unsafe work but did not actively inspect for safety or employ a safety plan), or where the general contractor reserves the general right of supervision over the independent contractor but does not retain control over the incidental aspects of the independent contractor's work (Rangel v. Brookhaven Constructors, Inc., 307 Ill. App. 3d 835, 839 (1999)).

In this case, Madison Services neither controlled the safety measures employed at the construction nor retained control over the incidental aspects of the work done by EGM. Pursuant

to section 8.1 of the contract, EGM was required to provide all labor, materials, and equipment needed to complete the work. Section 3.2.2 provided that Madison Services would not give orders or instructions directly to EGM's employees. Under section 2.1, Madison Services and EGM agreed to be "mutually bound by the terms of [the] Agreement." Also, under section 4.3.1, EGM agreed to take reasonable safety precautions with respect to the performance of the contract. In addition, section 4.4.1 required EGM to keep the premises and surrounding area clean and specifically stated that EGM shall not be held responsible for unclean conditions caused by other contractors or subcontractors. These provisions indicate that Madison Services intended that EGM would be responsible for directing the work and safety of its own employees and responsible for only those unclean conditions it created on the premises.

During construction, Madison Services' representative, Reinersman, visited the site to look only at the construction's progress, and he never observed any safety violations or directed EGM's employees regarding the manner of their work. Madison Services relied on EGM for safety. Madison services did not provide safety classes, inspectors, or equipment at the work site. Rather, EGM conducted safety meetings with employees, provided the equipment, inspected the equipment and ensured its employees had hard hats and safety glasses. Furthermore, the rights retained by Madison Services to stop work and inspect progress are general rights of supervision and not a retention of control over the incidental aspects of EGM's work.

While we find that the contract did not grant Madison Services sufficient control over EGM's work to create a duty to plaintiff, our analysis of section 414 does not end here. It is

possible that a duty to a subcontractor's employee may be created by the contractor's actions where the contractor retains control over the incidental aspects of the independent contractor's work. See Bieruta v. Klein Creek Corp., 331 Ill. App. 3d 269, 271-72 (2002).

In Bieruta, this court considered a case where the contractor and subcontractor had not agreed on the scope of the contractor's control over the subcontractor's work. Applying section 414, this court held that the defendant general contractor was not liable for injuries sustained by an independent contractor's employee, because the defendant did not retain control over the "incidental aspects" of the independent contractor's work. This court found that there was no evidence that the defendant contractor exerted control over the work site or directed its "operative details," or that the subcontractor was not entirely free to perform the work in its own way. Bieruta, 331 Ill. App. 3d at 276.

Similarly, in this case, the facts indicate that Madison Services did not control EGM's work. There is no evidence that Madison Services directed the "operative details" of the work site or that EGM was not free to perform the demolition work in its own way. The evidence showed that Madison Services did not participate in or supervise any of the demolition work. Reinersman, on behalf of Madison Services, visited the work site at the beginning of the project merely to inform EGM of the scope of the work and any subsequent visits were to monitor the progress of the work. Reinersman did not direct EGM employees as to the operative details as to how to perform their work and did not give any job assignments to EGM's employees. The evidence showed that Olson, EGM's superintendent, ran the job and that EGM's workers were supervised by its lead man, Jerry Johansen. Olson himself testified that Madison Services did

not supervise EGM's work and that EGM workers would go to him if they had any type of problems. Accordingly, we find that Madison Services contractually and actually removed itself from the incidental aspects of the construction and safety work done by EGM, and that summary judgment for Madison Services was appropriate on plaintiff's section 414 claim.

B. The Prime Contract and Federal Safety Regulations

Plaintiff further contends that because the Prime Contract between Madison Services and the United States Government imposed nondelegable safety standards under OSHA and its regulations, Madison Services owed a duty of care to plaintiff. We disagree.

The Occupational Safety and Health Act of 1970 (OSHA) creates a government program to enforce compliance with federal occupational safety and health standards by employers in the private sector. 29 U.S.C. §§651, 654 (2000); Downs, 358 Ill. App. 3d at 208. Part 1926 of Title 29 of the Code of Federal Regulations sets forth the specific construction standards. 29 C.F.R. §1926 (2004). OSHA explicitly declares that it shall not be construed to supersede, to enlarge, to diminish, or to affect in any manner "the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries *** of employees arising out of or in the course of, employment." 29 U.S.C. §653(b)(4) (2000).

In Downs, this court held that OSHA and its accompanying regulations did not impose a nondelegable duty on the general contractor to maintain safety at the construction site by virtue of the fact that the contract between the general contractor and independent contractor that employed the plaintiff required the independent contractor to comply with OSHA. Downs, 358

1-06-0086

Ill. App. 3d 201. In that case, this court determined that the defendant general contractor could not be held liable under plaintiff's section 414 claim, as governed by Illinois law. Therefore, liability would have resulted only from affecting the defendant's right to contract away private liability for injuries, or from enlarging defendant's liabilities to plaintiff under section 414 by declaring that, via OSHA, defendant retained control of the independent contractor's work. This court explained that "[d]oing so would create an exception that would swallow the rule, because no matter what steps defendant would take to shield itself from liability, the OSHA inevitably would pierce defendant's armor, striking a fatal blow that otherwise would be blocked under the theories advanced by plaintiff." Downs, 358 Ill. App. 3d at 209. We find no reason to depart from our previous determination that a nondelegable duty does not arise under OSHA, because OSHA creates only a governmental program to enforce compliance and does not deal with the assignment of liability among contractors.

Plaintiff, nonetheless, argues that certain provisions in the prime contract between Madison Services and the federal government prohibited Madison Services from delegating its responsibilities for safety and control of the work site. Plaintiff points to the following portions of the prime contract in support of his position:

"SUPERINTENDENCE BY THE CONTRACTOR

At all times during the performance of this contract and until the work is completed and accepted, the Contractor shall directly superintend the work *or assign* and have on the work site a competent superintendent who is satisfactory

-18-

to the Contracting Officer and has authority to act for the Contractor.

***

ACCIDENT PREVENTION

(a) The Contractor shall provide and maintain work environments and procedures which will (1) safeguard the public and Government personnel, property, materials, supplies, and equipment exposed to Contractor operations and activities; (2) avoid interruptions of Government operations and delays in project completion dates; and (3) control costs in the performance of this contract.

(b) For these purposes on contracts for construction or dismantling, demolition, or removal of improvements, the Contractor shall–

(1)  Provide appropriate safety barricades, signs, and signal lights;

(2) Comply with the standards issued by the Secretary of Labor at 29 C.F.R. Part 1926 and 29 C.F.R. Part 1910; and

(3) Ensure that any additional measures the Contracting Officer determines to be reasonably necessary for the purposes are taken.

(c) If this contract is for construction or dismantling, demolition or removal of improvements with any Department of Defense agency or component, the Contractor shall comply with all pertinent provisions of the latest version of U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, in effect on the date of the solicitation.

(d) Whenever the Contracting Officer becomes aware of any

noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Government personnel, the Contracting Officer shall notify the Contractor orally, with written confirmation, and request immediate initiation of corrective action. This notice, when delivered to the Contractor or the Contractor's representative at the work site, shall be deemed sufficient notice of the noncompliance and that corrective action is required. After receiving the notice, the Contractor shall immediately take corrective action. If the Contractor fails or refuses to promptly take corrective action, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. The Contractor shall not be entitled to any equitable adjustment of the contract price or extension of the performance schedule on any stop work order issued under this clause.

(e) The Contractor shall insert this clause, including this paragraph (e), with appropriate changes in the designation of the parties, in subcontracts.

***

Compliance with regulations: All work, including the handling of hazardous materials or the disturbance of dismantling of structures containing hazardous materials shall comply with the applicable requirements of 29 C.F.R. 1926/1910. *** Where there is a conflict between applicable regulations the most stringent shall apply.

Contractor Responsibility: The contractor shall assume full responsibility and

liability for compliance with all applicable regulations pertaining to the health and safety of personnel during the execution of work, and shall hold the Government harmless for any action on his part or that of [his] employees or subcontractors, which results in illness, injury or death." (Emphasis added.)

Contrary to plaintiff's assertion, nothing in these provisions prohibited Madison Services from delegating its duty to maintain safety at the work site to its subcontractor, EGM. Plaintiff cites no authority for its argument that Madison Services was prohibited from delegating its safety responsibilities because the project was federally funded and on federal property. As previously discussed, Madison Services, through its contract with EGM, contractually and actually removed itself from the incidental aspects of the construction and safety work performed by EGM. Accordingly, we conclude that summary judgment was appropriate on plaintiff's section 414 claim.

### C. Section 343 of the Restatement (Second) of Torts

Finally, plaintiff contends that Madison Services owed him a duty of care under the premises liability theory of section 343 of the Restatement (Second) of Torts.

Illinois has adopted the rules set forth in sections 343 and 343A of the Restatement (Second) of Torts regarding the duty of possessors of land to their invitees. Section 343 provides:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger."

Restatement (Second) of Torts §343 (1965).

This duty does not extend to risks created by "open and obvious" conditions. Bucheleres v. Chicago Park District, 171 Ill. 2d 435, 447-48 (1996).

Plaintiff argues that Madison Services failed to exercise reasonable care and make adequate inspections to discover accumulated dust on the floor of the work site and the unsafe ladder condition. Plaintiff argues that even if the dust on the floor and ladder condition were "open and obvious" conditions, the deliberate encounter exception applies to impose liability on Madison Services. Comment f to section 343A describes the deliberate encounter exception:

"There are *** cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee ***. ***

***[A] reason [to expect harm] may also arise where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages

-22-

1-06-0086

of doing so would outweigh the apparent risk."  Restatement (Second) of

Torts §343A, Comment f, at 220 (1965).

In this case, we find that plaintiff's premises liability argument under sections 343 and

343A fails because no evidence was presented that Madison Services knew or should have

known of a dangerous condition where plaintiff was working.  See Restatement (Second) of

Torts § 343 (1965); Cochran, 358 Ill. App. 3d at 873.  Plaintiff himself testified that at the time

of his injury, he was using a ladder that he set up and that no one told him to use the particular

ladder in question.  Plaintiff testified that in his opinion the ladder retracted due to a problem

with the locking mechanism.  Plaintiff also testified that he had no contact with any employee or

anyone related to Madison Services and that Madison Services did not provide any of the

equipment for the work project.  Mastri, owner of Jay's HVAC, another subcontractor, testified

that there was "maybe just dust" on the floor but that plaintiff could have swept the floor before

he began working.  The evidence also showed that Reinersman, Madison Services' project

manager,  visited the work site on several occasions and that no safety issues arose during those

visits.  The evidence showed that Reinersman was not present on the day of plaintiff's injury and

did not conduct a post-accident investigation.  Reinersman also testified that during a

preconstruction meeting, the issue of dust protection was raised to protect the rest of the facility

during EGM's demolition work and that EGM put in place dust protection procedures.  The

evidence further showed that Madison Services had no role in enforcing safety rules on the work

site and that subcontractors were responsible for cleaning up after themselves. Therefore there is

no evidence to show that Reinersman, or anyone else from Madison Services, was aware or

1-06-0086

should have been aware of any allegedly dangerous condition at the time of plaintiff's injury. Accordingly, no genuine issue of material fact as to Madison Services' lack of knowledge exists in this case.

### III.  Conclusion

For the above stated reasons, we affirm the circuit court's determination where Madison Services owed no duty of care under the theories advanced by plaintiff.

Affirmed.

NEVILLE and MURPHY, JJ., concur.