THIRD DIVISION
March 26, 2008

No. 1-07-1740

| | | |
|---|---|---|
| NOE CALDERON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No.04L13401 |
| RESIDENTIAL HOMES OF AMERICA, INC., | ) | |
| and HEARTHSTONE, INC., | ) | The Honorable |
| | ) | Elizabeth Budzinski, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Noe Calderon appeals from a trial court order granting summary judgment in favor of defendants Hearthstone, Inc. (Hearthstone), and Residential Homes of America, Inc. (Residential Homes), on Calderon's construction negligence claim, which he filed after sustaining injuries while performing construction work in a housing development. On appeal, Calderon disputes the trial court's ruling, asserting that genuine issues of material fact exist precluding summary judgment. Specifically, Calderon contends that genuine issues of material fact exist as to whether Hearthstone and Residential Homes owed him a duty pursuant to section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts §414 (1965)), whether they breached their duty, and whether his accident was caused by an open and obvious condition. We affirm.

The following facts have been adduced from the pleadings, depositions, and affidavits present in the record. On April 9, 2002, Residential Homes entered into a subcontract with Kap

Roofing, Calderon's employer, to provide roofing services on The Greens & The Woods of Turnberry Housing Development (Development). The subcontract identified Residential Homes as the "construction manager"[1] of the Development and set forth the rights, responsibilities, and expectations of both parties. In pertinent part, the agreement provided that Residential Homes was responsible for setting the construction schedule and Kap Roofing was required to adhere to that schedule. With regard to the quality of work, the contract provided that Kap Roofing, as the contractor, was required to "inspect its own work for quality and completion," but specified that "all final decisions as to quality and completion" would be made by Residential Homes. Residential Homes also reserved the right to request Kap Roofing to correct any defects "within five (5) days from notification" and if corrections were not made, to deduct the cost from the contract price.

The subcontract was accompanied by several attachments and exhibits. One of these exhibits, "Exhibit D," set forth various roofing and sheet metal specifications and included two provisions pertaining to safety protocol at the Development site. Specifically, paragraph 10 required all work completed by Kap Roofing to "be in accordance with OSHA [Occupational Safety and Health Administration] safety standards," while paragraph 13 indicated that Residential Homes had prepared a safety manual, reiterated that work needed to conform to OSHA standards, and reserved Residential Homes the right to terminate the contract if the work failed to conform to OSHA safety standards.

---

[1] Although Residential Homes is identified as the construction manager in the contract, Calderon points out that Residential Homes admitted in its answers to Calderon's interrogatories that it was working as a general contractor in the Development.

On February 1, 2003, Calderon was working on lot 16 in the Development when he fell off a ladder as he was carrying a 60-pound bundle of shingles to the rooftop and sustained injuries. He filed a complaint sounding in negligence against Hearthstone and Residential Homes on December 1, 2004. In his complaint, Calderon alleged that Hearthstone and Residential Homes were in charge of the construction of residential homes in the Development and owed him a duty of care "with respect to the construction, safety and maintenance of said construction site and proper use of ladders on the construction site." Calderon's complaint further alleged that defendants were negligent and breached their duty of care. Specifically, Calderon's complaint alleged that the defendants were negligent in failing to: provide a safe work-place; inspect the work site and ladder to ensure their safety; abide by OSHA safety standards; secure the ladder; and provide a safe means to transport shingles to the rooftop. Calderon asserted that his accident and resulting injuries were a "direct and proximate result" of defendants' negligence.

Hearthstone and Residential Homes filed an answer denying the material allegations asserted in Calderon's complaint. Specifically, defendants denied they owed him a duty and breached that duty. Thereafter, the parties engaged in discovery and conducted a number of depositions.

At Calderon's deposition, he explained that he began working in the roofing trade in 1996 and commenced employment with Kap Roofing in 2002. To learn his craft, Calderon attended union apprenticeship courses as well as an OSHA safety course. On January 20, 2003, Keith Pinn, Calderon's Kap Roofing supervisor, sent him to work on lot 16 in the Development. Prior

to receiving this assignment, Calderon had worked for several weeks on other lots in the Development. As a skilled worker, Calderon did not need to receive instruction as to how to perform his job responsibilities and did not report to any individual associated with Residential Homes prior to commencing work. Calderon did, however, have daily conversations with Residential Homes' superintendent. But, the conversations were brief, lasting only a few minutes, and solely concerned job progress. The superintendent would then drive around the Development and visit each of the lots.

Calderon was responsible for installing shingles on the rooftops of the homes in the Development, which he did using his own personal tools as well as equipment made available to him by Kap Roofing. On Saturday, February 1, 2003, at approximately 8 a.m., Calderon arrived at the Development to continue his work on lot 16 and saw that there were bundles of shingles on the ground in front of the garage. Although the company that delivered the shingles was supposed to lift the shingles to the rooftop, it had not done so. As a result, on approximately 20 occasions between January 23, 2003, to February 1, 2003, Calderon transferred the shingle bundles onto the rooftop himself, carrying the 60-pound bundles on his right shoulder as he traversed the ladder. On February 1, 2003, after making four prior successful trips carrying bundles of shingles onto the rooftop, Calderon commenced his fifth such trip. He successfully climbed the ladder with a bundle of shingles on his right shoulder; however, when he attempted to move from the ladder to the rooftop, Calderon lost his balance and fell off the ladder and sustained injuries. He believed that the weight of the shingles caused him to fall.

Prior to his accident, Calderon had not complained to the superintendent of the

4

Development about the shingle company's failure to transfer the shingles to the rooftops. However, Calderon believed the superintendent was aware of the situation because "a few days before the accident," he was present when Calderon carried a bundle of shingles to the rooftop. Calderon clarified that he could not be sure that the superintendent actually saw him, but explained that the superintendent "was always driving around" the Development. Pursuant to Calderon's understanding, Residential Homes was responsible for the overall safety of the jobsite; however, he acknowledged that he never engaged in discussions with any person from Residential Homes, including the superintendent, about safety issues.

Andrew Danner, Residential Homes' superintendent, testified that Hearthstone, the developer, did not maintain any signs or trailers on site at the Development, but that Residential Homes had a trailer on site. As the superintendent, he was at the Development "every week day" and was the only Residential Homes employee that maintained a daily presence at the site. Danner explained that he "would spend the entire day" at the Development, although "most of [his] time was in the trailer handling paperwork." He did, however, drive around the Development every day to check on work progress. He explained that he would "make [his] rounds and check on things" but that he "[did not] supervise the work." Danner, did however, check to see whether the work was "done in a quality manner" and would inform the subcontractors if he noticed any defects. His main responsibility, however, was to set the construction schedule and speak with individual subcontractors about the schedule. The subcontractors, in turn, were responsible for scheduling their own laborers and for providing their laborers with tools and equipment. Based on his observations of the work progress, Danner

deduced that some work was being performed on the weekends, but that this occurred "very infrequently." According to his understanding, Residential Homes "didn't specifically disallow" weekend work; however, he was never present at the Development on the weekend.

In making his daily rounds through the Development, Danner saw shingles transported to the rooftop by way of a "boom crane" or a "conveyor-type apparatus." He did not remember ever seeing laborers transport the shingles onto the rooftop themselves. Pursuant to his understanding, laborers are supposed to maintain three points of contact, and use both hands, while climbing a ladder.

When it came to safety, Danner testified that "safety is up to the contractors. They have their responsibility for that." Despite the reference to a safety manual in Exhibit D of the subcontract, Danner stated that Residential Homes did not have a safety manual. Accordingly, because "the contractors had their own safety policies" that were enforced by their supervisors, Danner only spoke to contractors about safety if he "saw something that was grossly wrong" and unsafe. He confirmed that he could stop a laborer from working if he saw him performing a dangerous task. Although he conducted "some" meetings about safety, the meetings were designed to ensure that the subcontractors were enforcing their own safety policies.

Donald Schadle, Kap Roofing's project manager, explained that he went to the Development site "periodically" and had conversations with Andrew Danner "on a monthly basis." He testified that it was the responsibility of crew leaders to supervise the day-to-day activities of Kap Roofing employees and that Calderon was one of Kap Roofing's crew leaders. Schadle explained that Kap Roofing supplied its employees with their tools and materials,

including a fall protection kit. As the project manager, Shadle discussed safety with employees and explained that Kap Roofing conducted several "big seminars" on safety protocol. Based on his knowledge, Residential Homes did not discuss safety issues with Kap Roofing employees and did not instruct Calderon as to how to perform his job and lay shingles. Residential Homes could, however, send a Kap Roofing employee home if he was doing something dangerous.

In discussing Calderon's accident, Schadle indicated that as project manager, he was supposed to be notified if any Kap Roofing employee was instructed to work on the weekend, but that he had not been informed that Calderon was going to be at the jobsite on Saturday, February 1, 2003. He confirmed that it was customary in the roofing industry for the shingle supplier to transport the shingle bundles to the roof. However, in the event that the roofing supplier did not do so, Kap Roofing possessed a "laddervator," a device that could safely accomplish the task. At the time of Calderon's accident, the laddervator was stored at Kap Roofing's Crystal Lake office, located approximately 5 to 10 minutes from the Development. Schadle opined that if the shingle supplier placed the shingle bundles on the ground instead of on the roof, and they remained there for a 24-hour period, the general contractor should have noticed because the general contractor maintains a daily presence at the jobsite.

Hearthstone and Residential Homes subsequently filed a motion for summary judgment, arguing that they owed Calderon no duty because he was an independent contractor and they did not exercise the necessary degree of control over his work to impose a duty upon them pursuant to section 414 of the Restatement. Moreover, Hearthstone and Residential Homes contended that even if they owed Calderon a duty, there was no breach of that duty because neither Hearthstone

nor Residential Homes had notice of the dangers confronted by Calderon. Finally, Hearthstone and Residential Homes asserted that summary judgment was proper because Calderon's injury was caused by an open and obvious dangerous condition, since he knew that transporting shingles to the roof by hand was unreasonably dangerous.

The defendants supported their motion for summary judgment with various exhibits, including an affidavit from Ann Danner, the president of Residential Homes. In her affidavit, Danner averred that Kap Roofing was an independent contractor and that Residential Homes "did not negotiate to retail control over the details of how plaintiff performed his work." She further stated that Residential Homes "did not have a full time safety superintendent," "did not provide safety classes," did not have knowledge of Calderon's intent to appear at the Development on Saturday, February 1, 2003, and did not know that any laborers were using unsafe work methods or confronting unsafe work conditions.

Calderon filed a response arguing that there were genuine issues of material fact that rendered summary judgment inappropriate. Specifically, Calderon asserted that various provisions in the subcontract created a genuine issue of material fact as to whether Residential Homes exercised control over the manner in which he performed his work. In particular, Calderon noted that the contract provided that all final decisions as to quality of work were left to Residential Homes and that Residential Homes had the option to terminate the contract for violations of OSHA safety standards. Moreover, Calderon asserted that Andrew Danner's daily presence at the Development site showed that Residential Homes exerted substantial supervisory control over his work. Calderon also asserted that a genuine issue of material fact existed as to

whether the "deliberate encounter exception" to the open and obvious doctrine applied. Finally, Calderon argued that summary judgment was improper because there was a genuine issue of material fact as to whether Hearthstone or Residential Homes knew or should have known that Calderon had been manually transporting the shingles to the rooftops himself. Calderon's response, though supported by a number of exhibits, did not contain any affidavits.

On June 28, 2007, the trial court entered a written order granting Hearthstone and Residential Homes' motion for summary judgment. The written order merely reflected that the trial court's order "disposes of all matters" and did not contain any discussion as to the reasons behind the trial court's disposition. Thereafter, Calderon filed a timely notice on appeal.

On appeal, Calderon asserts that the trial court erred in awarding summary judgment in favor of Hearthstone and Residential Homes because a number of genuine issues of material fact exist, making the trial court's disposition inappropriate.

Summary judgment is appropriately granted where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2006); Tefco Construction Co. v. Continental Community Bank & Trust Co., 357 Ill. App. 3d 714, 718 (2005). Although summary judgment has been deemed a "drastic means of disposing of litigation" (Purtill v. Hess, 111 Ill. 2d 229, 240 (1986)), it is nonetheless an appropriate mechanism to employ to expeditiously dispose of a lawsuit when the moving party's right is clear and free from doubt (Morris v. Margulis, 197 Ill. 2d 28, 35 (2001)). Our review is de novo. Rich v. Principal Life Insurance Co., 226 Ill. 2d 359, 370 (2007); Judge-Zeit

v. General Parking Corp., 376 Ill. App. 3d 573, 578 (2007).

Initially, Calderon contends that a genuine issue of material fact exists as to whether defendants owed him a duty pursuant to section 414 of the Restatement (Restatement (Second) of Torts §414 (1965)).

To properly state a negligence claim under section 414 of the Restatement, a plaintiff must allege that the defendant owed him a duty, breached that duty, and that the breach of the duty was the proximate cause of his injury. Martens v. MCL Construction Corp., 347 Ill. App. 3d 303, 315 (2004). Whether a duty will be imposed pursuant to section 414 of the Restatement presents a question of law and depends upon whether the defendant controlled the plaintiff's work to such an extent that liability should result. Martens, 347 Ill. App. 3d at 315; Kotecki v. Walsh Construction Co., 333 Ill. App. 3d 583, 588 (2002); Rangel v. Brookhaven Constructors, Inc., 307 Ill. App. 3d 835, 837 (1999).

As a general rule, one who entrusts work to an independent contractor will not be liable for the acts or omissions of that independent contractor. Joyce v. Mastri, 371 Ill. App. 3d 64, 73 (2007); Martens, 347 Ill. App. 3d at 313. "This is because the principal generally does not supervise the details of the independent contractor's work and, as a result, is not in a good position to prevent negligent performance." Pestka v. Town of Fort Sheridan Co., L.L.C., 371 Ill. App. 3d 286, 300 (2007); see also Martens, 347 Ill. App. 3d at 313. However, section 414 of the Restatement sets forth the "retained control exception" to this general rule. Martens, 347 Ill. App. 3d at 314; Shaughnessy v. Skender Construction Co., 342 Ill. App. 3d 730, 737 (2003).

1-07-1470

Specifically, this section encapsulates commonlaw negligence principles[2] and provides:

> "One who entrusts work to an independent contractor, but who retains the control of any
> of any part of the work, is subject to liability for the physical harm to others for whose
> safety the employer owes a duty to exercise reasonable care, which is caused by his
> failure to exercise his control with reasonable care." Restatement (Second) of Torts §414
> (1965).

The comments accompanying section 414 "describe a continuum of control," and provide some illumination as to the necessary degree of control a defendant must exercise to be subject to liability under this section. Martens, 347 Ill. App. 3d at 314. In particular, Comment *a* to section 414 provides:

> "If the employer of an independent contractor retains control over the operative
> detail of doing any part of the work, he is subject to liability for the negligence of the
> employees of the contractor engaged therein, under the rules of that part of the law of
> Agency which deals with the relation of master and servant. The employer, may,

---

[2] Prior to 1994, construction negligence claims were analyzed pursuant to the terms of the Illinois Structural Work Act (Act) (740 ILCS 150/1 et seq. (West 1994)), which existed along with common law negligence principles. However, in 1994, the Illinois legislature repealed the Act, and now construction negligence claims are evaluated in accordance with the common law negligence principles encapsulated by the Restatement. See generally, Martens, 347 Ill. App. 3d at 313 (providing a discussion of the history of section 414 of the Restatement and the Act as well as the relationship between the two); Shaughnessy, 342 Ill. App. 3d at 737 (same).

11

however, retain less control than that which is necessary to subject him to liability as a master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." Restatement (Second) of Torts §414, Comment *a*, at 387 (1965).

Comment *a* thus distinguishes between vicarious and direct liability. Cochran v. George Sollitt Construction Co., 358 Ill. App. 3d 865, 874 (2005). In particular, it clarifies that "the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care." Cochran, 358 Ill. App. 3d at 874.

Comment *b* provides further illumination on the theory of direct liability described in Comment *a*. In particular, Comment *b* states:

> "The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of

reasonable care should know that the subcontractor's work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so." Restatement (Second) of Torts § 414, Comment *b*, at 387-88 (1965).

Comment *c*, on the other hand, describes the necessary degree of retained control a general contractor must exercise to be subject to vicarious liability. It provides:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts, § 414, Comment *c*, at 388 (1965).

In this case, Calderon advances both vicarious and direct liability claims. We will first address his vicarious liability arguments. However, before we begin our analysis of the merit of Calderon's appeal, we note that all of his arguments relate solely to Residential Homes.

Although he employs the term "defendants" throughout his appellate brief, Calderon advances no arguments and discusses no evidence pertaining to Hearthstone. Notably, the headings in the argument section of his brief relate solely to Residential Homes. Accordingly, Calderon has waived any argument against Hearthstone (see 210 Ill. 2d R. 341(h)(7) ("Points not argued are waived")), and we affirm the trial court's order awarding summary judgment in favor of Hearthstone. We now address the arguments he has raised against Residential Homes.

Initially, Calderon contends that a genuine issue of material fact exists as to whether Residential Homes contractually retained the necessary degree of "control over safety," to impose a duty and be subject to vicarious liability pursuant to section 414 of the Restatement.

As a general rule, "[t]he best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists." Joyce, 371 Ill. App. 3d at 74. When the contract reveals that the general contractor has retained control over safety at a construction site, then summary judgment in favor of the general contractor is not appropriate. Joyce, 371 Ill. App. 3d at 75.

For example, in Moorehead v. Mustang Construction Co., 354 Ill. App. 3d 456, 461 (2004), the Third District reversed a trial court order awarding summary judgment in favor of a general contractor when the contract provided that the general contractor was to " 'be fully and solely responsible for the jobsite safety.' " Most recently, in Wilkerson v. Paul H. Schwender, Inc., No. 1-06-2653, slip op. at 9-10 (February 11, 2008), this court reversed a summary judgment order in favor of a general contractor because, in part, the contract required subcontractors "to attend safety meetings and comply with [the general contractor's] list of 21

14

safety procedures."

In this case, Calderon primarily relies on paragraphs 10 and 13 of Exhibit D, one of the exhibits that accompanied Residential Homes' contract with Kap Roofing, to show that Residential Homes contractually retained control over safety at the Development.

Paragraph 10 provides that "[a]ll work performed by this CONTRACTOR shall be in accordance with OSHA safety standards," while paragraph 13 states:

"The CONSTRUCTION MANAGER has prepared a Safety Policy manual which is available at the CONSTRUCTION MANAGER[']S office. The work performed at this development shall be done in strict accordance with OSHA safety standards. If CONTRACTOR fails to conform to OSHA standards, the CONSTRUCTION MANAGER has the option to terminate any contract or agreement with this CONTRACTOR."

We disagree that either of these contractual provisions indicates that Residential Homes retained the necessary degree of control over safety to impose a duty pursuant to section 414 of the Restatement. Initially, we note that "OSHA regulations do not create a duty of care." Recio v. GR-MHA Corp., 366 Ill. App. 3d 48, 58 (2006); see also Downs v. Steel & Craft Builders, Inc., 358 Ill. App. 3d 201, 208-09 (2005). Moreover, "the existence of a safety program, safety manual or safety direction does not constitute retained control per se." Martens, 347 Ill. App. 3d at 318. That is because "[p]enalizing a general contractor's efforts to promote safety and coordinate a general safety program among various independent contractors at a large jobsite hardly serves to advance the goal of work site safety." Martens, 347 Ill. App. 3d at 318.

15

Accordingly, a safety program or manual must " 'sufficiently affect[] a contractor's means and methods of doing its work' " to " 'bring the defendant within the ambit of the retained control exception.' " Cochran v. George Sollitt Construction Co., 358 Ill. App. 3d 856, 876 (2005), quoting Martens, 347 Ill. App. 3d at 318-19.

In this case, notwithstanding the contract's brief reference to a safety manual, there is no evidence that a safety manual actually existed let alone that it affected Calderon's means and manner of performing work sufficient to impose a duty pursuant to section 414 of the Restatement. Indeed, no safety manual appears in the record. See Foutch v. O'Bryant, 99 Ill. 2d 389, 391-92 (1984) (holding that an appellant bears the burden of providing a sufficiently complete record to allow for meaningful appellate review and that any doubts arising from the incompleteness of the record will be resolved against the appellant). Moreover, Andrew Danner, Residential Homes' superintendent, testified that Residential Homes did not have, nor did it disseminate, such a manual to the contractors. However, assuming arguendo, that such a manual did exist, there is nothing in the record to suggest that the manual sufficiently affected Calderon's means and methods of doing his work, such that it would " 'bring [Residential Homes] within the ambit of the retained control exception. [Citation.]' " Cochran, 358 Ill. App. 3d at 876.

Notably, Danner testified that the individual contractors were responsible for the safety of their employees and that "the contractors had their own safety policies," which were enforced by their own supervisors. Although Danner acknowledged that he could stop a Kap Roofing employee from performing work if he saw the employee engaging in a dangerous task, the general right to stop work is not sufficient to impose a duty pursuant to section 414 of the

Restatement. Restatement (Second) of Torts, § 414, Comment *c*, at 388 (1965); see also Shaughnessy, 342 Ill. App. 3d at 733 (no duty was imposed on the general contractor even though its superintendent "had the authority to stop the work if he detected unsafe practices or conditions"). Moreover, Don Schadle, Kap Roofing's project manager, could not recall an instance where Danner or any other Residential Homes employee sent a Kap Roofing employee home for engaging in unsafe work. Compare Wilkerson, slip op. at 9 (finding that the "best evidence" that a general contractor retained more than a general right of supervision was the fact that it actually exercised its discretionary authority to stop a subcontractor's work). Furthermore, while Danner testified that he conducted "some" meetings about safety, the meetings were designed to ensure that the subcontractors were implementing and enforcing their own safety policies, not to mandate compliance with any safety measures imposed by Residential Homes.

Moreover, the uncontradicted affidavit submitted by Ann Danner, Residential Homes' President, reveals that Residential Homes did not employ a full-time safety superintendent. Central Illinois Light Co. v. Home Insurance Co., 213 Ill. 2d 141, 170-71 (2004) (facts in an affidavit submitted with a motion for summary judgment that are not contradicted by counter-affidavit must be accepted as true); F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C, 372 Ill. App. 3d 89, 93 (2007) (same). In addition, Schadle and Calderon both confirmed Residential Homes' minimal role with respect to safety at the Development. Schadle testified that Residential Homes did not discuss safety with Kap Roofing's employees and that Kap Roofing conducted its own meetings on safety measures, while Calderon stated that he never had discussions with any person from Residential Homes, including Danner, about safety issues. The

testimony thus reveals that Residential Homes did not contractually or actually exercise control over safety at the Development site to such an extent that it affected the means and methods that Calderon employed in performing work at the jobsite.

Calderon, however, relies on <u>Bokodi v. Foster Wheeler Robbins, Inc.</u>, 312 Ill. App. 3d 1051, 1063 (2000), where we reversed a trial court order awarding summary judgment in favor of a general contractor and its subsidiaries on the plaintiff's construction negligence claim based on our finding that the "defendants went to great lengths to control the safety standards at the work site." In that case, the general contractor employed a site manager, a field superintendent, and a safety manager, conducted weekly meetings to discuss construction plans as well as separate weekly meetings to discuss safety, conducted regular walkthroughs of the jobsite to address and correct safety violations, was empowered to stop the work of any subcontractor if there was any safety hazard that posed an immediate threat, and required the subcontractors to abide by 29 different safety measures and procedures. <u>Bokodi</u>, 312 Ill. App. 3d at 1063-64.

We find <u>Bokodi</u> distinguishable. Unlike <u>Bokodi</u>, Residential Homes did not employ a full-time safety superintendent, did not require adherence to specific safety measures, did not conduct weekly safety meetings, and did not engage in the kind of pervasive day-to-day supervision present in <u>Bokodi</u>. Residential Homes' involvement with safety in the Development pales in comparison to that present in <u>Bokodi</u>. Accordingly, we find that Residential Homes' minimal involvement with safety does not provide us with cause to impose a duty pursuant to section 414 of the Restatement and does not subject Residential Homes to vicarious liability.

Calderon nonetheless asserts that in addition to safety, Residential Homes contractually

and actually reserved control over the means and methods of his work.

In particular, Calderon notes that pursuant to the subcontract, Kap Roofting was required to "adhere to the construction schedule (and 'Time Schedule') established by [Residential Homes]," "inspect its own work for quality and completion, provided however, that all final decisions as to quality and completion shall be made by [Residential Homes]," and "correct [any defects in workmanship or materials] within five (5) days from notification by [Residential Homes]." In addition, exhibit D set forth various sheet metal and roofing specifications and required Kap Roofing to, among other things, use galvanized roofing nails "in conformance with the roofing manufacturer's directions and specifications," "[p]rovide roof rain diverts where required," "not leave any ladders standing overnight," and "pick up all debris upon the completion of their phase of construction."

We disagree with Calderon that these contractual provisions reveal that Residential Homes retained more than general supervisory rights. Notably, "the rights retained by [a general contractor] to schedule and stop work [and] to order changes, *** are general rights of supervision and not a retention of control over the incidental aspects of the work." Downs, 358 Ill. App. 3d at 206; see also Pestka, 371 Ill. App. 3d at 301. Moreover, Calderon's argument that Residential Homes contractually retained and exercised control over the means and method of his work becomes even more unpersuasive in light of the deposition testimony.

During their depositions, Danner, Shadle, and Calderon confirmed that Residential Homes did not provide Calderon with tools or other equipment. See Shaughnessy, 342 Ill. App. 3d at 738; Cochran, 358 Ill. App. 3d at 869, 880. Calderon also testified that he did not receive

any instruction as to how to perform his job responsibilities and did not report to Residential Homes' superintendent prior to commencing his daily work. In addition, Shadle confirmed that Residential Homes did not instruct Calderon how to perform his job. See Shaughnessy, 342 Ill. App. 3d at 738.

Calderon, however, places much emphasis on the fact that Danner maintained a daily presence at the jobsite, and contends in his reply brief that Danner "constantly monitored the job site." Although "pervasive supervision and monitoring" may lead to the imposition of a duty pursuant to section 414 of the Restatement (see Shaughnessy, 342 Ill. App. 3d at 739, citing Bokodi, 312 Ill. App. 3d 1051), Calderon's own deposition testimony refutes his characterization that Danner engaged in constant monitoring. Although Calderon testified that he conversed with Danner daily, he explained that these conversations lasted only "a few minutes. Like two minutes" and solely concerned job progress. Specifically, Calderon stated that Danner "would ask me when am I going to finish the work. And I would answer him, we are going to finish it as soon as we can." Danner then would visit other sites in the Development. Danner, himself, confirmed that he was at the Development site every weekday, but that "most of the time [he] was in the trailer handling paperwork." His main responsibility was to establish the construction schedule and speak to the subcontractors about scheduling. We thus disagree that Residential Homes, through Danner, engaged in constant monitoring of the Development site. Indeed, the mere fact that Danner maintained a daily presence at the jobsite does not serve to trigger a duty pursuant to section 414 of the Restatement because the record reveals that his daily visits to each construction site were designed to check on job progress. See, e.g., Rogers v. West Construction

20

Co., 252 Ill. App. 3d 103, 106, 109 (1993) (imposing no duty pursuant to section 414 of the Restatement on a general contractor even though its superintendent "made one or two visits each day" to the jobsite because his "responsibility was primarily focused on daily progress, not supervising the manner in which the work was done"); see also Joyce, 371 Ill. App. 3d at 75 (imposing no duty when general contractor's site manager "visited the site to look only at the construction's progress").

Accordingly, we thus find that Calderon has failed to raise a genuine issue of material fact as to whether Residential Homes retained the necessary degree of control over safety, as well as the means and method of his work, necessary to impose a duty pursuant to section 414 of the Restatement and be subject to vicarious liability. Alternatively, Calderon contends that there is a genuine issue of material fact as to whether Residential Homes may be subject to direct liability due to its failure to exercise supervisory control with reasonable care.

"[T]he general contractor's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability." Cochran, 358 Ill. App. 3d at 879-80. When a general contractor has an insufficient opportunity to observe unsafe working conditions, then knowledge will not be inferred and direct liability will not ensue. See Pestka, 371 Ill. App. 3d at 302-03; Cochran, 358 Ill. App. 3d at 880; Rangel, 307 Ill. App. 3d at 839.

Here, Calderon again relies on Bokodi and asserts that Residential Homes' knowledge of the dangerous conditions may be inferred based on the fact that Danner maintained a daily presence on the jobsite. In Bokodi, we held the general contractor should have known that the plaintiff was confronting a dangerous work condition "due to the fact that the defendants were

constantly monitoring this work site." Bokodi, 312 Ill. App. 3d at 1063. We have already rejected Calderon's claim that Danner's daily presence can be equated with constant monitoring. Calderon's and Danner's deposition testimony establishes that Danner remained in his trailer the majority of the day and that when he did leave his trailer and conversed with Calderon, the conversations lasted mere minutes and only concerned job progress. This can hardly be considered constant monitoring. Accordingly, Bokodi is not persuasive.

Calderon, however, emphasizes that he traversed the ladder carrying bundles of shingles on approximately 20 occasions prior to his fall. Although we acknowledge that whether knowledge may be inferred depends upon a general contractor's opportunity to observe the plaintiff engage in dangerous activities, and that the number of times a plaintiff confronts a dangerous condition is relevant to this analysis (see Pestka, 371 Ill. App. 3d at 302-03; Cochran, 358 Ill. App. 3d at 880; Rangel, 307 Ill. App. 3d at 839), we do not find that the fact that Calderon performed a dangerous task on multiple occasions supports an inference of knowledge in this case. Importantly, of the 20 occasions that Calderon transported shingle bundles to the rooftops manually, he could only recall one instance were Danner might have seen him performing that task. However, Calderon conceded that because Danner was driving around the Development site, he was unsure whether Danner actually saw him. Notably, Danner testified that he never saw a Kap Roofing employee manually transport shingles onto a rooftop; rather, he saw shingles transported through use of a "boom crane" or a "conveyor-type apparatus." Calderon also acknowledged that he never notified any person that the shingle company had failed to transfer the shingles to the rooftops. Finally, we note that the accident happened on a

22

Saturday, when neither Danner nor Shadle, Kap Roofing's project manner, had notice that Calderon was going to be at the Development site. Because work did not usually occur on the weekend, Danner was not present at the Development site, and accordingly, he had no opportunity to observe Calderon transporting the shingles manually to the roof prior to his fall. There is no basis for direct liability on these facts.

For the foregoing reasons, we find that Calderon has failed to raise any genuine issue of material fact as to whether Hearthstone or Residential Homes owed him a duty. "[I]f no duty exists there is no recovery" under section 414 of the Restatement. <u>Joyce</u>, 371 Ill. App. 3d at 73. Because we find that Calderon failed to raise a genuine issue of as to whether defendants owed him a duty, we need not address his remaining alternative arguments contesting the trial court's summary judgment order (<u>i.e.</u>, whether defendants breached their duty and whether his accident was caused by an open and obvious condition). Accordingly, we affirm the trial court's order awarding summary judgment in favor of Hearthstone and Residential Homes.

Affirmed.

QUINN, P.J., and CUNNINGHAM, J., concur.