2018 IL App (1st) 170819
Opinion filed: February 16, 2018

FIFTH DIVISION

No. 1-17-0819

| | | |
|---|---|---|
| WLM RETAIL TRUST, a Delaware Statutory Trust, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CH 12971 |
| | ) | |
| TRAMLAW REMAINDERMAN LIMITED | ) | Honorable |
| PARTNERSHIP, an Illinois Limited Partnership, | ) | Neil H. Cohen, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
PRESIDING JUSTICE REYES and JUSTICE LAMPKIN concurred in the judgment and opinion.

**OPINION**

¶ 1    In this declaratory judgment action involving a contract dispute, defendant-appellant Tramlaw Remainderman Limited Partnership (Tramlaw), an Illinois limited partnership, appeals from summary judgment awarded in favor of plaintiff-appellee WLM Retail Trust (WLM), a Delaware statutory trust. For the following reasons, we affirm.

¶ 2                                 I. BACKGROUND

¶ 3    In 1991, United States Fidelity and Guaranty Company (USF&G) owned a portfolio of commercial real estate that was comprised of 30 properties improved with retail buildings. Pursuant to long-term leases, 29 of those properties were occupied by WalMart stores and 1 was occupied by a Sam's Club. One of those properties, occupied by a WalMart and located in Oklahoma City, Oklahoma, is at issue in this lawsuit (the property). WalMart's lease for the property contained an initial term that expired on January 31, 2009, with WalMart having the

option to extend the lease for "five (5) successive individual extended terms of five (5) years each."

¶ 4    USF&G decided to sell all 30 properties in 1991 and placed the portfolio out for bid. Public Service Resources Corporation (PSRC) was the winning bidder.[1] PSRC was represented in the transaction by Cornerstone Financial Advisers LP (Cornerstone), an investment advisory firm located in Chicago. The structure of the resulting contract for sale was complex, with the parties to this lawsuit—WLM and Tramlaw—being entities created to facilitate the transaction.

¶ 5    Stripping the transaction to its essence, and excluding a number of contractual terms not relevant here, PSRC both created and was a beneficiary of WLM, which purchased an estate for years[2] in each of the 30 properties. The estate for years in each property was to run until the expiration of the initial term of the existing WalMart (or Sam's Club) lease upon that property, exclusive of any extensions thereof. In addition, a number of other individuals—including a number of Cornerstone employees—formed Tramlaw to purchase the remainder interest in the 30 properties, with that remainder interest commencing upon the expiration of the estate for years. By structuring the transaction in this fashion, WLM would be able to depreciate its interest in the land over the duration of the estate for years and obtain significant tax benefits. The contract for sale was executed on September 19, 1991. WLM paid $108,614,794.81 for the various interests it purchased, while Tramlaw paid $1,226,000.

¶ 6    In addition to the contract for sale—indeed, pursuant to the explicit terms thereof—WLM and Tramlaw also entered into an "Option and Estate for Years Agreement" for each of the

---

[1]While the parties only specifically refer to the WalMart leased properties in their briefs, it is clear from the record that all 30 properties were sold in this transaction.

[2]Essentially, an estate for years constitutes the right to the possession of land for a known term. Black's Law Dictionary 1191 (abridged 7th ed. 2000).

properties, including the property at issue here (the Agreement). The Agreement, executed on February 26, 1992, provided WLM with two options with respect to the property in exchange for a payment of $48,500: a "Ground Lease Option" and a "Purchase Option." The ground lease option, contained in section 2 of the Agreement, granted WLM the ability to lease the property at the conclusion of the estate for years for a term of 5 years, with the possibility to thereafter renew the lease for up to 9 additional 5-year terms. The purchase option, contained in section 3 of the Agreement, granted WLM the option to purchase the property, either before or after the expiration of the estate for years, upon the occurrence of a number of specified events. The very first event the Agreement identified as triggering WLM's purchase option was as follows: "The Wal-Mart Lease shall expire or terminate for any reason, whether by default or otherwise, and whether or not prior to the expiration of the stated term thereof."

¶ 7      Section 3(B) of the Agreement also provided that, in the event WLM sought to purchase the property due to the expiration or termination of the WalMart lease, then (1) the fair market value of the property had to be determined within 360 days of the date the WalMart lease ended, (2) WLM would have up to 30 days thereafter to decide whether or not to purchase the property, and (3) WLM and Tramlaw would have up to 90 days thereafter to complete the sale of the property to WLM. Thus, the parties had up to a total of 480 days following the expiration or termination of the WalMart lease to complete a sale of the property to WLM.

¶ 8      The Agreement also contains a choice-of-law provisions, mandating that the law of Oklahoma govern its construction.

¶ 9      On October 6, 2008, WLM provided Tramlaw notice that it was exercising the first of its ground lease options to extend its lease of the property for a five-year term running from February 1, 2009, to January 31, 2014. Notably, this occurred prior to the expiration of both the

initial term of WalMart's lease and the estate for years held by WLM. On November 13, 2008, WalMart exercised the first of its options to extend its lease on the property for a five-year term that would run for the exact same duration as WLM's ground lease.

¶ 10    On December 5, 2013, WLM exercised the second of its ground lease options to extend its lease of the property for a five-year term running from February 1, 2014, to January 31, 2019. However, WalMart did not elect to further extend its lease on the property, and its lease therefore expired on January 31, 2014.

¶ 11    On June 16, 2014, WLM notified Tramlaw that, because the WalMart lease had expired, WLM now wished to initiate the appraisal process with respect to its possible exercise of the option to purchase the property. On July 17, 2014, Tramlaw responded by asserting that WLM had not timely sought to exercise the purchase option. Noting that the estate for years expired on January 31, 2009, Tramlaw contended that WLM's attempt to initiate the purchase option ran afoul of a termination clause contained in section 14 of the Agreement, which provided: "The Options contained in this Agreement shall terminate and be of no further force or effect upon the later of the expiration of (i) the Estate for Years or (ii) the Additional Notice Period."[3]

¶ 12    On August 8, 2014, WLM filed this lawsuit against Tramlaw, seeking a declaration that WLM had timely sought to exercise its purchase option. Tramlaw answered the complaint, asserted affirmative defenses of waiver and estoppel, and filed a counterclaim seeking a declaratory judgment that, pursuant to section 14 of Agreement, the purchase option terminated with the expiration of the estate for years in 2009, rendering WLM's attempt to purchase the

_____

[3]The "Additional Notice Period" is a provision in the Agreement providing for the possible extension of time within which WLM could exercise the ground lease option after the expiration of the estate for years. As it is undisputed that WLM initially exercised the ground lease option prior to the expiration of the estate for years, the parties agree that this portion of section 14 is irrelevant to this appeal.

property in 2014 untimely.[4] WLM answered the affirmative defenses and the counterclaim, and the parties engaged in discovery, including taking the depositions of a number of individuals involved with the original transactions.

¶ 13    Thereafter, the parties filed cross-motions for summary judgment. In a written order entered on February 27, 2017, the circuit court granted WLM's motion and denied Tramlaw's cross-motion, concluding that both the plain language of the Agreement and the extrinsic evidence established that "WLM timely and properly sought to exercise the Purchase Option of the Option Agreement on June 16, 2014 and currently has the right to exercise the Purchase Option." This appeal followed.

¶ 14                                    II. ANALYSIS

¶ 15    While Tramlaw contends that the circuit court ruled incorrectly on the parties' cross-motions for summary judgment, for the following reasons, we affirm.

¶ 16    Summary judgment is appropriate only where the pleadings, depositions, admissions, and affidavits, viewed in the light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016). When parties file cross-motions for summary judgment, they agree that no factual issues exist and that the disposition of the case turns on the circuit court's resolution of purely legal issues. *Maryland Casualty Co. v. Dough Management Co.*, 2015 IL App (1st) 141520, ¶ 45. "The interpretation of a contract is a question of law and therefore may be decided on a motion for summary judgment." *Joyce v. Mastri*, 371 Ill. App. 3d 64, 74 (2007). We review *de novo* both a trial court's grant of summary judgment (*Coleman v. East Joliet Fire*

---

[4]Tramlaw also sought a declaration that WLM failed to properly comply with the appraisal process contained in the Agreement, but that claim was dismissed pursuant to settlement below and is not at issue on appeal.

*Protection District*, 2016 IL 117952, ¶ 20), as well as its interpretation of a contract (*CitiMortgage, Inc. v. Parille*, 2016 IL App (2d) 150286, ¶ 24).

¶ 17    The Agreement contains a choice-of-law provision, mandating that the law of Oklahoma governs its construction. Subject to limitations not applicable here, such provisions are to be given effect. *Hall v. Sprint Spectrum L.P.*, 376 Ill. App. 3d 822, 825-26 (2007). Thus, we apply the law of Oklahoma, which—as that state's supreme court has recognized—provides a comprehensive statutory scheme to govern the interpretation of contractual agreements. *Pitco Production Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 12 n.16, 63 P.3d 541 (citing Okla. Stat. tit. 15, §§ 151-178 (1991)).

¶ 18    We begin by addressing Tramlaw's argument that, because WalMart's lease expired in 2009, WLM's 2014 attempt to initiate the appraisal process with respect to its purchase option was untimely. Specifically, Tramlaw contends that the Agreement only permitted WLM to purchase the property upon the expiration or termination of the *original term* of the WalMart lease, which expired on January 31, 2009. Then, citing to the appraisal and purchase procedures contained in the Agreement and discussed above (*supra* ¶ 7), Tramlaw contends that the parties only had an additional 480 days—or until May 2010—to complete the sale of the property. Thus, Tramlaw contends that WLM could not have sought to initiate its purchase option with respect to the property in June 2014, after the five-year extended term of the WalMart lease expired on January 31, 2014. We disagree with this argument.

¶ 19    Under Oklahoma law, the "language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Okla. Stat. tit. 15, § 154 (2011). Furthermore, the "words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical

6

sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." Okla. Stat. tit. 15, § 160 (2011).

¶ 20    Here, the language of the Agreement plainly grants WLM an option to purchase the property if the "Wal-Mart Lease shall expire or terminate for any reason, whether by default or otherwise, and whether or not prior to the expiration of the stated term thereof." The term "Wal-Mart Lease" is specifically defined in the Agreement as "a long-term lease (as amended prior to or after the date hereof ***)" held by WalMart with respect to the property. That definition does not, by its plain language, refer solely to the original term of the WalMart lease.

¶ 21    Furthermore, we note that the Agreement also specifically provided that, should WLM seek to exercise its purchase option in this circumstance, the fair market value of the property must be determined "within 360 days of *any* expiration or termination of the Wal-Mart Lease." (Emphasis added.) By referring to "any" expiration or termination of the lease, rather than "the" expiration or termination, the Agreement clearly intends to refer to the end of either the original term of the WalMart lease or to the end of any of the "five (5) successive individual extended terms of five (5) years each."

¶ 22    The validity of this interpretation of the Agreement is made even more apparent by looking to the language of the WalMart lease itself, which is a contractual agreement central to, specifically referred to, and made a part of all of the relevant agreements among the parties at issue in this dispute: *i.e.*, the original contract for sale, the Agreement, and the ground lease. As such, it triggers a provision of Oklahoma law providing that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Okla. Stat. tit. 15, § 158 (2011). Section 3 of the WalMart lease specifically provides—after stating that the original term ends on January 31, 2009, and WalMart has the

option to extend the lease for up to five successive five-year extended terms—that "[a]s used in this Lease, 'original term' means the original term hereinabove in this Section 3 specified; 'extended term' means the term of any extension of the original term of this Lease pursuant to this Section 3, and 'term,' 'Lease term,' and 'term of this Lease" embrace both [the] original term and extended term or terms."

¶ 23    In light of the definition contained in the WalMart lease itself, it is evident that when the Agreement granted WLM an option to purchase the property if the "Wal-Mart Lease shall expire or terminate for any reason, whether by default or otherwise, and whether or not prior to the expiration of *the stated term thereof*" (emphasis added), WLM was granted the option to purchase the property upon the expiration or termination of "both [the] original term and extended term or terms" of the WalMart lease. WLM's attempt to initiate the appraisal process with respect to its purchase option, made in 2014 shortly after the expiration of the first and only extended term of the WalMart lease, was therefore not untimely on this basis.

¶ 24    Next, we address Tramlaw's argument that WLM's attempt to exercise the purchase option in the Agreement was untimely because it came well after the expiration of the estate for years granted to WLM in the original contract for sale.

¶ 25    It is certainly true, and undisputed, that the estate for years expired on January 31, 2009. It is also true that the termination clause contained in section 14 of the Agreement specifically provides that "[t]he Options contained in this Agreement shall terminate and be of no further force or effect upon the later of the expiration of (i) the Estate for Years or (ii) the Additional Notice Period."[5] The term "Options" is not specifically defined in the Agreement, and WLM contends that this term need not and should not be construed to include reference to the purchase

_____

[5]Again, the Additional Notice Period is not at issue in this appeal.

option contained in the Agreement. However, understanding this term—stated in the plural—in its ordinary and popular sense (see Okla. Stat. tit. 15, § 160 (2011)), we conclude that it must be construed to refer to *both* of the *only* two options contained in the Agreement; *i.e.*, both the ground lease option and the purchase option. Viewed in isolation, therefore, the termination clause contained in section 14 of the Agreement would appear to provide support for Tramlaw's assertion that WLM's purchase option terminated and was of no further force or effect on January 31, 2009, well before WLM attempted to exercise that option in 2014.

¶ 26    However, we do not view section 14 of the Agreement in isolation. Under Oklahoma law, the "whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." Okla. Stat. tit. 15, § 157 (2011). Nevertheless, "[p]articular clauses of a contract are subordinate to its general intent." Okla. Stat. tit. 15, § 166 (2011). "Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clause, subordinate to the general intent and purposes of the whole contract." Okla. Stat. tit. 15, § 168 (2011). Thus, "[w]ords in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected." Okla. Stat. tit. 15, § 169 (2011). Similarly, "[w]hen through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded." Okla. Stat. tit. 15, § 156 (2011).

¶ 27    Here, the general intent and purpose of the Agreement as a whole—as expressed in numerous other provisions—clearly reflect that the apparent limitation on WLM's purchase option contained in section 14 must be viewed as a mistake, an accident, or simply as a specific clause so repugnant to and subordinate to the general intent and purpose of the Agreement that it must be rejected and disregarded.

9

¶ 28    For example, and as discussed above, the Agreement clearly granted WLM a purchase option exercisable upon the expiration or termination of "both [the] original term and extended term or terms" of the WalMart lease. As the estate for years and the original term of the WalMart lease were coterminous, the extended term or terms of the WalMart lease could *only* expire or terminate *after* the expiration of the estate for years. Thus, the contractual terms defining the purchase option itself reflect that the option was intended to survive the expiration of the estate for years.

¶ 29    Similarly, section 3(B) of the Agreement specifically reflects that WLM may exercise the purchase option upon the expiration or termination of the WalMart lease "whether such date is *before or after* the expiration of the Estate for Years." (Emphasis added.) And, in section 3(C), the Agreement provides that should WLM elect not to purchase the property after a fair market value is arrived at pursuant to the appraisal process, such an election "shall not impair the Ground Lease Option, the Purchase Option or any future exercise of either thereof." Such language clearly contemplates that the purchase option may be initiated—even multiple times— after the expiration of the estate for years.

¶ 30    There are still more provisions in the Agreement leading to the same conclusion. One of the other specified events triggering the purchase option is contained in section 3(A)(g). While that event was not triggered here, it is notable that the event could not be triggered prior to the "twentieth anniversary of the date" of the Agreement. That anniversary fell on February 26, 2012, well after the expiration of the estate for years. Similarly, section 3(A) of the Agreement provides that the purchase price for the sale of the property, in the event of the expiration or termination of the WalMart lease, was to be the greater of the amount reached through the Agreement's appraisal process or an amount listed in Schedule II of the Agreement. Schedule II

contained a list of steadily-increasing prices for the remainder, listed by date. The dates contained therein began with the date the Agreement was executed, but ran well past the expiration of the estate for years. Finally, while section 3(D) of the Agreement includes a definitive temporal limit on the exercise of the purchase option, that section provides: "Notwithstanding anything to the contrary contained herein, the Purchase Option shall not be exercisable after January 31, 2059." That date is also well past the expiration of the estate for years.

¶ 31    In light of each of these various provisions, and reading the Agreement as a whole, it is impossible not to conclude that the Agreement reflects the parties' general intent that the purchase option was to survive the expiration of the estate for years. As such, under Oklahoma law, the contrary provision contained solely in section 14 of the Agreement must be viewed as a mistake, an accident, or simply as a specific clause so repugnant to and subordinate to the general intent and purpose of the Agreement that it must be rejected and disregarded. As such, the circuit court properly concluded that WLM timely initiated the purchase option contained in the Agreement and properly granted summary judgment in favor of WLM.

¶ 32    Because we resolve this appeal solely on the basis of the language of the Agreement and the statutory law of Oklahoma, we do not address any of the extrinsic evidence discussed by the parties. See Okla. Stat. tit. 15, § 155 (2011) ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible, subject, however, to the other provisions of this article.").

¶ 33                                   III. CONCLUSION

¶ 34    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 35    Affirmed.