**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230162-U

Order filed February 29, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| OTTER CREEK SHOPPING CENTER, LLC, an Illinois Limited Liability Company, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0162 Circuit No. 20-L-785 |
| | ) ) | Honorable |
| NE CAPITAL GROUP BSD, LLC, a New York Limited Liability Company, | ) ) | Neal W. Cerne, Judge, Presiding. |
| Defendant-Appellee. | ) ) | |

JUSTICE ALBRECHT delivered the judgment of the court.
Justices Holdridge and Peterson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   On cross-motions for summary judgment, where the seller alleged buyer breached the parties' purchase and sale agreement in a commercial real estate transaction, the buyer was entitled to summary judgment when the parties failed to procure consent from the loan lender which was a condition of the parties' agreement.

¶ 2    Plaintiff, Otter Creek Shopping Center, LLC (Otter Creek), brought suit against defendant, NE Capital Group BSD, LLC (NE Capital), alleging breach of contract for the failure to close their real estate transaction. The circuit court granted NE Capital's cross-motions for

summary judgment concluding that defendant appropriately exercised its right to terminate the parties' purchase agreement. Otter Creek appeals the circuit court's decision to grant summary judgment in favor of NE Capital. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Otter Creek owns a large lot at 260 South Randall Road in Elgin, Illinois. A string of retail stores occupy the lot, and the property is collectively known as the Otter Creek Shopping Center. On November 23, 2016, NE Capital, a private equity investment group, entered into a purchase and sale agreement with Otter Creek for the property. The purchase price in the original purchase and sale agreement was $20.5 million. The contract also called for the contemporaneous execution of an earnest money escrow agreement that required NE Capital to submit $200,000 in funds.

¶ 5        At the time the parties entered the contract, Otter Creek had pledged the property as security for a loan from Wells Fargo Bank, N.A. (Wells Fargo). Accordingly, NE Capital was to assume the loan as a condition of purchase. Section 4.1 of the purchase and sale agreement obligated Otter Creek to notify Wells Fargo of the prospective buyer so that it may provide application requirements for NE Capital to assume the loan. "Lender's Consent," a phrase simply indicating Wells Fargo's agreement to allow NE Capital to assume the loan, was defined in this provision as:

> "Lender's Consent shall be deemed to have been given when Lender indicates in writing that it has completed its underwriting of the Property and Purchaser and has approved the Loan Assumption by Purchaser subject to the

2

execution of the final Loan Assumption Documents (as hereinafter defined) by Lender, Seller and Purchaser."[1]

¶ 6    Section 4.2 imposed a corresponding obligation on NE Capital to "use commercially reasonable efforts to effectuate the Loan Assumption *** _provided_ that Purchaser shall not be required to agree to any modifications to any of the existing Loan Documents ***." (Emphasis in original.) The ability for the parties to close their real estate transaction, as explained in section 4.4 of the purchase and sale agreement, was "expressly contingent upon Purchaser obtaining Lender's Consent (including the release of all existing guarantors under the Existing Loan) and the Loan Assumption occurring and closing." Under section 10.1(d), Otter Creek was obligated to maintain the property "in its present order and condition *** [and] make all necessary repairs and replacements thereto, including those repairs and replacements which are the Seller's responsibility pursuant to the Leases[.]"

¶ 7    The purchase and sale agreement was subsequently amended twice. The effective date of the first amendment was January 30, 2017. The second amendment was executed by the parties on October 17, 2018, and increased the purchase price to $21.4 million. The second amendment aimed to facilitate the lender's consent process. To do so, the parties retained Draper & Kramer, Inc., a mortgage banking and residential management firm to assist in the loan assumption process with Wells Fargo. The second amendment also revised section 4.5 to state that in the event lender's consent was not procured within 180 days after the second amendment's execution, NE Capital was afforded the right to terminate the agreement upon notice to Otter Creek. If this was the means of termination, the second amendment further directed return of the

---

[1]Section 4.4(ii) of the purchase and sale agreement defined "Loan Assumption Documents" as "loan assumption agreements and other documentation as Lender shall reasonably require to effectuate the Loan Assumption ***."

3

earnest money to NE Capital if it was not solely responsible for the "material failure to comply with the timeline of this Amendment[.]"

¶ 8       In early January 2019, Wells Fargo commissioned an inspection of the property. On March 25, 2019, a Wells Fargo commercial mortgage representative, Harold Hammond, sent a four-page letter to NE Capital's CEO[2] approving its assumption of the loan subject to certain conditions. Provision 15 in the letter focused on the rundown state of the shopping center's parking lot and informed NE Capital that repairs were needed through the following language:

> "Proposed Borrower to correct the major deferred maintenance identified in Lender's January 4, 2019 inspection report within 120 days of closing. The deferred maintenance includes: (a) potholes in the asphalt driveways which pose trip hazards (30% prevalent) (life safety), and (b) alligatoring asphalt with worn striping on the parking and driveway surfaces (60% prevalent), \*\*\*. Proposed Borrower shall delivery [*sic*] to Lender satisfactory evidence of the completion of the repairs promptly after work is completed."

¶ 9       Wells Fargo attached pictures depicting the potholes and "alligatoring" asphalt to the letter, designating the attachment as "deferred maintenance." Provision 15 concluded, "[f]ailure to timely cure/repair the Deferred Maintenance, subject to [Wells Fargo's] satisfactory review, will result in an Event of Default under the Loan documents." The letter would remain valid for 60 days but would terminate thereafter.

¶ 10       The record establishes that the parties were unclear who would undertake the repair responsibility. Stelios Aktipis, Otter Creek's principal, testified that near the time of the January

---

[2]The letter identified the proposed borrower as OC Partners BH LLC, which the record reveals was the legal entity designated to assume the loan and somehow affiliated with NE Capital.

4, 2019, inspection, Wells Fargo asked Otter Creek to "do some maintenance" on the parking lot. Aktipis stated that Otter Creek addressed the pothole concern, but at some point he communicated to Wells Fargo that Otter Creek would not be correcting the "alligatoring" asphalt. In the weeks that followed Wells Fargo's conditional approval letter, Otter Creek and NE Capital corresponded several times with regards to the state of the parking lot. In a March 28, 2019, email, an Otter Creek representative wrote to NE Capital "[w]ith regard to the bid for the parking lot. [Aktipis] would like you to speak directly with the contractor," adding that "[h]e would like you to satisfy yourself that the bid they have given is sufficient to cover the issues noted by the lender."

¶ 11     The record further reveals that on April 3, 2019, Otter Creek received a quote from a paving company that estimated $248,000 for parking lot restoration utilizing non-union labor. A different paving company provided a quote to NE Capital later that month for an estimated total repair price of $346,000. An Otter Creek representative sent another email on April 8, 2019, updating the representatives from Otter Creek, NE Capital, and Draper & Kramer, Inc. on the state of the sale. The email provided that,

> "One of the conditions in the [conditional approval] letter addresses the parking lot. Going back to the original discussions between Seller and Buyer when the property was put under LOI (2016), Buyer had indicated it would not seek a price reduction if the deferred maintenance on the property was found to be $250k or less. This was discussed and further on in the transaction there were emails/amendments which addressed this. Fast forward to today, we understand the Buyer wants to confirm that lender required repairs do not exceed $250k. Seller has already performed maintenance on the property to address potholes

5

discussed by the lender. Seller has a proposal from a reputable contractor to address remaining parking lot issues. Proposal has been shared with Buyer. Seller would like [to] give Buyer an opportunity to get on the phone with the contractor to confirm the scope of work, pricing etc."

¶ 12        The April 8, 2019, email referred to NE Capital's initial statements concerning the parking lot, which was reduced to writing in an August 25, 2016, email. There, NE Capital's CEO addressed the condition of the parking lot, stating "I will accept parking lot and roof in 'as is' condition but we shouldn't have more then [*sic*] $250,000 of year one repairs in the property condition report we'll order."

¶ 13        Following the April email, discussions between the parties continued to flounder. Otter Creek sent a default letter to NE Capital on June 25, 2019. Six days later, Otter Creek sent a letter to NE Capital and its representatives claiming there was a material failure on NE Capital's part to comply with the second amended agreement timelines and directing payment from the escrow. The next day, on July 2, 2019, NE Capital sent a letter to Otter Creek claiming Otter Creek had failed "to maintain the parking lot in violation of Section 10.1 of the Purchase Agreement," a deficient condition recognized in the Wells Fargo conditional approval letter, and terminated the contract.

¶ 14        On July 23, 2020, Otter Creek filed a single-count complaint against NE Capital alleging breach of contract. Within its pleading, it alleged Wells Fargo gave notice of its consent to NE Capital and NE Capital's failure to close constituted a breach of their agreement. NE Capital filed its answer, affirmative defenses, and counterclaims. Within its pleading, NE Capital alleged Otter Creek had breached its obligations under the contract by failing to make all necessary repairs and sought declaratory judgment.

¶ 15          Otter Creek filed a motion for summary judgment on May 19, 2021, maintaining that NE Capital breached the agreement through its default in the loan assumption process and there remained no genuine issue of material fact on whether NE Capital had defaulted. Following the court's denial of NE Capital's motion for continuance to conduct further discovery pursuant to Illinois Supreme Court Rule 191(b), NE Capital filed a cross-motion for summary judgment on September 8, 2021. Ill. S. Ct. R. 191(b) (eff. Jan. 4, 2013). After briefing and arguments, the court denied both motions on November 10, 2021.

¶ 16          Thereafter, Otter Creek filed a second and third motion for partial summary judgment. The second motion, filed on May 9, 2022, sought judgment on whether NE Capital obtained lender's consent from Wells Fargo to assume the loan. The third motion, filed on June 2, 2022, sought judgment on whether NE Capital waived its counterclaim of breach by relinquishing specific rights to terminate the agreement. NE Capital filed corresponding cross-motions for summary judgment on these issues.

¶ 17          Two depositions primarily supported the parties' summary judgment motions. Aktipis testified that from 2016 through the beginning of 2019, Otter Creek routinely maintained the parking lot "every spring" by "go[ing] through and fill[ing] up potholes." The routine maintenance did not involve fixing the "alligatoring" pavement. He estimated annual parking lot repairs to range between $20,000 and $50,000. Aktipis divulged that in October or November 2020, Otter Creek repaved the parking lot at a cost of "$500,000 almost, 450[,000]" and made further repairs to its roof for "a couple of hundred thousand dollars."

¶ 18          Hammond testified concerning Wells Fargo's conditional approval letter. He stated that lender's consent was provided on this assumption request, later characterizing it as "conditional approval." He clarified that it was immaterial who completed the repairs between NE Capital and

7

Otter Creek, so long as they were done. According to Hammond "for us to close this loan, the borrower, the proposed borrower would have to sign an assumption agreement agreeing to all these conditions," adding "we would not have closed without them agreeing to these conditions." Hammond explained there was little concern over the deferred maintenance requirement because there was money ($254,995.92) set aside in the reserve to cover the repairs. However, he later agreed that he did not know how much it would cost to repair the parking lot issues for this instance. On May 17, 2019—a week prior to the conditional approval letter's termination date— NE Capital's CEO requested a 30-day extension. After payment of a $5000 fee to extend, Wells Fargo granted NE Capital's request. Hammond later added at his deposition, "I have never seen a deal not close[ ] because of deferred maintenance." When pressed, Hammond described the appearance of a deferred maintenance obligation in a lender's consent letter as "typical."

¶ 19    A hearing commenced on August 2, 2022, to address lender's consent. There, the court surmised that because paragraph 15 of the lender's conditional approval letter required repair of the parking lot for NE Capital to assume the loan, the letter created a new condition that was not in the original terms of the parties' agreement. The court classified paragraph 15 of the conditional approval letter as a "modif[ication] *** [that] was providing an acceleration of that which is not part of the loan." It denied Otter Creek's partial motion and granted NE Capital's cross-motion, finding that lender's consent was not provided as required by paragraph 4.1 of the purchase and sale agreement.

¶ 20    A hearing on the parties' cross-motions concerning the affirmative defense of waiver proceeded on September 7, 2022. Following arguments, the court reiterated its interpretation of Wells Fargo's conditional approval letter. The letter "was not really an assumption of the mortgage. It was an assumption. But it also included an additional term" in reference to the

deferred maintenance parking lot repairs. The court found that NE Capital acted in good faith to resolve the additional term through discussions and negotiations. It also found that NE Capital did not waive any conditions of the contract and the contract was properly terminated "because there was no lender's consent ***." Thereby, it denied Otter Creek's partial motion and granted NE Capital's cross-motion. In a contemporaneous written order, the court concluded that "no further substantive issues appear to remain, as the PSA was properly terminated, and if any funds are being held in escrow, they should be returned to Defendant."

¶ 21     Otter Creek brought a motion to reconsider the court's orders under the premise that the court had not reviewed the loan documents[3] and genuine issues of material fact remained about whether the lender's consent letter modified such. Indeed, as argued within its motion, Otter Creek identified certain provisions in the 2013 loan document that addressed a borrower's general maintenance requirement and therefore, the maintenance request from the lender's conditional approval letter was not a modification. After a hearing held on March 21, 2023, the court denied the motion to reconsider, explaining that for assignment of the loan Wells Fargo required "that the parking lot had to be finished." The inclusion of the requirement to repair the parking lot within 120 days is an "additional term" and "a change in the loan agreement."

¶ 22     Otter Creek timely appealed.

## II. ANALYSIS

¶ 23     On appeal, Otter Creek argues that the circuit court erred in denying its summary judgment motion and in granting NE Capital's summary judgment motion because the court did not review the loan documents prior to finding that Wells Fargo's conditional approval letter

---

[3]At the conclusion of the August 2, 2022, hearing, Otter Creek's counsel conceded that it did not attach the original loan documents (executed by Otter Creek and Wells Fargo in 2013) to support its motions for summary judgment.

9

modified the underlying loan documents. Further, Otter Creek claims that the conditional approval letter did not modify the loan documents and contends summary judgment in its favor is warranted.

¶ 24        Summary judgment should be granted only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2022). Disposing of a case through summary judgment is a drastic measure, one which " 'should be allowed only when the right of the moving party is clear and free from doubt.' " *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22 (quoting *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004)).

¶ 25        "Construing the language of a contract is a matter of law appropriate for summary judgment." *Matter of Estate of Bresler*, 159 Ill. App. 3d 535, 539 (1987). The primary goal of contract construction is to "ascertain and give effect to the intention of the parties at the time the contract was formed." *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 77. We look to the instrument itself to determine the intention of the parties to a contract. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991). "Where the terms of an agreement are clear and unambiguous, they will be given their plain and ordinary meanings, and the parties' intent must be determined from the language of the agreement alone." *State Farm Fire & Casualty Co. v. Watts Regulator Co.*, 2016 IL App (2d) 160275, ¶ 27. We review a circuit court's "grant of summary judgment [citation], as well as its interpretation of a contract [citation]" *de novo*. *WLM Retail Trust v. Tramlaw Remainderman Ltd. Partnership*, 2018 IL App (1st) 170819, ¶ 16.

¶ 26                                A. Lender's Consent

¶ 27      A threshold issue before reaching Otter Creek's contention that the conditional approval letter did not modify the loan documents is whether Wells Fargo provided lender's consent for the assumption of the loan. We conclude that Wells Fargo did not provide lender's consent as defined in the parties' agreement. After commissioning inspection of the Otter Creek Shopping Center, Wells Fargo sent a letter on March 25, 2019, addressed to NE Capital's CEO which identified deficient conditions that needed repair in order for its subsidiary to assume the loan. Hammond testified that Wells Fargo would not close on the loan without the prospective borrower "agreeing to the conditions" stated in the letter. As indicated by its very title, the conditional approval letter was not an unqualified approval to assume the loan. Rather, Wells Fargo's conditional approval is analogous to a party's conditional acceptance such that no approval to assume the loan was conferred at all. *Loeb v. Gray*, 131 Ill. App. 3d 793, 799-800 (1985) ("[W]hen one accepts an offer conditionally *** no acceptance occurs; rather, there is a counterproposal requiring acceptance by the offeror before a valid contract is formed."); see *Anand v. Marple*, 167 Ill. App. 3d 918, 920 (1988). Therefore, before consideration as to whether the requirement to repair the deficient conditions within the letter modified the prospective borrower's obligations under the loan documents, we determine that we cannot interpret the letter as approval of loan assumption.

¶ 28      The agreement clearly sets out when lender's consent is deemed given. It required the lender to indicate in writing that it completed its underwriting and approved the loan assumption by the purchaser. Because this did not happen and lender's consent was not obtained, the parties could not close pursuant to the agreement. Furthermore, NE Capital was authorized by the second amendment to terminate the parties' agreement in the event that lender's consent was not procured. NE Capital exercised this option through its July 2, 2019, letter to Otter Creek.

11

¶ 29    While the circuit court focused on modification, it came to the same conclusion that we do here when it denied Otter Creek's partial motions for summary judgment and granted NE Capital's cross-motions. The lack of lender's consent is an adequate independent means to grant summary judgment in NE Capital's favor. We may affirm the circuit court's summary judgment award "on any basis appearing in the record whether or not the court relied on that basis or its reasoning was correct." *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 30                          B. Modification of Loan Documents

¶ 31    Otter Creek argues that the maintenance and repair responsibilities required by the lender in its conditional approval letter were already in place through its loan documents and therefore, the letter did not modify the loan documents. While we have held that no lender's consent was procured, which is an independent basis to affirm the circuit court, a plain reading of the agreement and its amendments seeks to apportion or absolve fault from the purchaser to determine which party receives the earnest money. Because the issue of contract modification is central to this determination, it warrants our consideration.

¶ 32    Contract modification occurs "when there is a change in one or more aspects which introduces new elements into the contract's details but leaves its general purpose and effect undisturbed." *In re Marriage of Frank*, 2015 IL App (3d) 140292, ¶ 13; see *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 468 (2004) ("Modification *** normally occurs when the parties agree to alter a contractual provision or to include additional obligations," while leaving the thrust of the original agreement intact). Here, we are not tasked with determining the validity of a contract modification, but rather must decide whether provision 15 in the lender's conditional approval letter modified the underlying loan documents. Paragraph 4.2 of the purchase and sale agreement provides that NE Capital as the new borrower, "shall not be

12

required to agree to any modifications to any of the existing Loan documents." As already addressed, if the parties failed to procure lender's consent, NE Capital was entitled to terminate the agreement. The second amendment to the purchase and sale agreement further provided that if termination was accomplished by this means, as long as NE Capital was not solely responsible for the "material failure to comply with the timeline of this Amendment" it was entitled to the return of its earnest money downpayment.

¶ 33    The March 25, 2019, conditional approval letter placed a 120-day deadline on correcting the deficient state of the Otter Creek Shopping Center's parking lot. Also, the letter stated that failure to timely repair the identified deficiencies would "result in an Event of Default under the Loan documents." Although the circuit court ruled that the 120-day repairment requirement was a modification without the benefit of reviewing the loan documents, our *de novo* review of the records, including the loan agreement, confirms the circuit court's conclusion that the "loan agreement doesn't say fix the parking lot within 120 days." There is no such temporal limitation or threat of default reflected in the loan documents.

¶ 34    Otter Creek calls our attention to several provisions within the 2013 loan agreement that refer to the borrower's repair obligations. Section 4.12.1 of the agreement places a mandatory obligation on the borrower to "promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated" and shifts the cost responsibility of repair to the borrower. Section 6.2 obligated Otter Creek to complete required repairs identified by Wells Fargo "on or before the respective deadline for each repair" as separately identified. In a document attached to the 2013 loan agreement, Wells Fargo identified two items that required repair, concrete retaining walls and street railings, and placed a repair deadline of 90-days after closing. These provisions do not address a 120-day deadline to repair a deficient condition. A

13

failure to comply with these repairs did not threaten an event of default or an acceleration of loan repayment as provision 15 of the conditional approval letter did.

¶ 35    By including provision 15 within the conditional approval letter, Wells Fargo conditioned loan assumption on the additional obligation to repair the Otter Creek Shopping Center's parking lot within 120 days of closing. Failure to abide by this deadline threatened default. These requirements are consistent with the definition of a modification. See *Richard W. McCarthy Trust Dated September 2, 2004 v. Illinois Casualty Co.,* 408 Ill. App. 3d 526, 534 (2011).

¶ 36    Furthermore, NE Capital's purported willingness to pay for up to $250,000 in repair from the August 25, 2016, email correspondence created no obligation to coordinate and pay repairs for the property. A merger clause in the agreement, as executed in November 2016, "supersede[d] any other previous agreement, oral or written, between the parties." What remained was Otter Creek's obligation pursuant to section 10.1(d) of the agreement to maintain the property and "make all necessary repairs and replacements thereto[.]" This responsibility extended to the lender's identified deficiencies as the ongoing borrower of the loan.

¶ 37    Having considered the interplay between the purchase and sale agreement, its amendments, and the 2013 loan agreement, we come to the conclusion that (1) the contractually defined lender's consent was not procured; (2) the provisions within the conditional approval letter modified the loan documents to which NE Capital did not have to assent; and (3) based on the language of the purchase and sale agreement, Otter Creek was contractually obligated to repair the deficient conditions required by the lender for loan assumption. Therefore, NE Capital was not solely responsible for the material failure to comply with the second amendment's timelines, and the trial court correctly entered summary judgment in its favor.

¶ 38                                   III. CONCLUSION

14

¶ 39    The judgment of the circuit court of Du Page County is affirmed.

¶ 40    Affirmed.