In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00064-CV

UNIVERSAL PROTECTION SERVICE, LP D/B/A ALLIED UNIVERSAL SECURITY AND UNIVERSAL PROTECTION SERVICE GP, INC.,
Appellants

V.

THE WOODLANDS MALL ASSOCIATES, LLC, Appellee

**On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 21-05-06367-CV**

## MEMORANDUM OPINION

Universal Protection Services, LP d/b/a Allied Universal Security and Universal Protection Service GP, Inc. (collectively, "Allied") and The Woodlands Mall Associates, LLC ("TWM") were parties to a Security Agreement ("the Agreement") whereby Allied would provide security services for TWM. Allied and TWM filed competing motions for summary judgment, and the trial court granted summary judgment for TWM. Allied appeals the trial court's Final Judgment, and

asks: in issues one and two whether the trial court incorrectly interpreted the provision requiring it to defend TWM; in issue three, whether TWM was entitled to summary judgment on the ground that Allied breached the Agreement by not procuring insurance; in issue four whether we should reverse the monetary awards to TWM where Allied had no duty to defend; and in issue five, whether we should render judgment for Allied on the duty-to-defend issue and remand the case for an award of reasonable expenses, attorney's fees, and costs. Analyzing issues one and two, we hold the trial court correctly interpreted the contractual provision as requiring Allied to defend TWM. Since this determination is dispositive of Allied's remaining issues, we need not reach issues three through five. *See* Tex. R. App. P. 47.1. We affirm the trial court's judgment for the reasons discussed below.

## BACKGROUND

Following a robbery in the mall parking lot, a patron, Penny Prater, sued Allied and TWM, along with Dillard's Inc., Dillard Texas East, LLC, and Dillard's Properties, Inc. (collectively, "Dillard's").[1] In her Original Petition and in her current live pleading, Prater describes leaving Dillard's in the mall and being attacked in the parking lot on her way back to her car. She also alleges, "There were no security guards present at the time of the attack[,]" and she "was forced to stumble back inside Dillard's to seek emergency assistance." Prater claims that all

---

[1]Dillard's is not a party to this appeal.

2

"Defendants failed to train their employees and staff in the most basic security procedures[]" and to "train their employees and other staff to monitor security cameras present on the premises, to recognize known indications of potential criminal activity, to deter criminal activity and timely report perceived criminal activity." She also alleges the Defendants "lacked adequate security policies and protocols" and "failed to appropriately employ or otherwise provide appropriately trained security personnel[.]"

Prater pleaded a negligence cause of action against all Defendants and asserts that Defendants negligently hired, trained, directed, supervised, and retained their employees. She claims Defendants failed to provide adequate security and failed "to formulate, have, and/or enforce adequate policies and procedures to prevent and/or deter criminal conduct at the Mall." Prater also pleaded a premises liability claim as to TWM and Dillard's. In support of the premises liability claim, among other things, she alleges that Dillard's and TWM failed to use ordinary care to protect her from the robber's criminal acts, failed "to exercise ordinary care to make the premises safe," and failed "to properly and safely maintain the premises."

The Agreement between Allied and TWM states that "Owner wishes to contract for security services at The Woodlands Mall[,]" and "Contractor provides security services and desires to provide security services at the Property pursuant to

3

the terms and conditions of this Agreement." The Agreement outlines Allied's responsibilities as follows:

3. **On-Site Contracted Service.**

A. <u>Engagement of Services</u>. Owner hereby engages Contractor to provide security services in accordance with the terms of this Agreement **("Services"),** which may be amended from time to time by the written agreement of the parties. This is a non-exclusive Agreement, Owner retains the right to use other providers of security services at any of the properties owned or managed by its affiliates.

B. <u>Security functions</u>. Contractor personnel assigned to the Property shall be responsible for promoting a pleasant shopping atmosphere and crime prevention efforts through patrol of the Property; seeking out and providing appropriate customer service to patrons; report any known safety hazards and enforcement of the Property's rules and regulations; appropriate response to incidents and emergencies; preliminary investigation and appropriate disposition of incidents; access control/physical security as appropriate during operating and non-operating hours; official reporting of activities, incidents, and inspection logs; and any special assignments and/or events related to the security/safety function of the Property as agreed upon by the parties. For the avoidance of doubt, "known" here is intended to refer to those types of safety hazards that Contractor in the normal exercise of its obligations under this Agreement would discover.

. . .

E. On-Site Personnel.

1. <u>Security Staff</u>. Contractor shall provide a stable staff that is trained and capable of providing the Services. Subject to the specific staffing requirements outlined in **Exhibit A,** Contractor will provide an on-site security manager **("Security Manager"),** assistant security

4

manager, supervisors, CCTV operators/dispatchers, security officers, and police officers, as applicable. The staff will be a combination of full-time and part-time employees in order to satisfy the specific deployment needs of the Property and maintain flexibility in scheduling.

. . .

J. Training.

1. Officer Training. Contractor shall promote and provide a trained and capable security staff. Contractor shall develop and deliver training courses as set forth on the attached **Exhibit B** to all security officers. Additionally, Contractor will deliver any State or Federally mandated training that is not included in **Exhibit B.** Owner may expand the training requirements as business needs dictate during the Term, in its sole discretion.
2. Certification Training. Training that requires certification may be acquired through a professionally recognized third party training system or an equivalent program developed by Contractor. Contractor is responsible for maintaining all required certifications.

. . .

8. **Insurance and Indemnification**

Contractor agrees to furnish and keep in force the following insurance for the Term:

. . .

b. Liability Insurance. Commercial General Liability Insurance with limits of Five Million Dollars ($5,000,000.00) per occurrence and aggregate applying on a "per location basis" which shall contain coverage for bodily injury, property damage, premises operations, completed operations, contractual liability

and contingent liability naming Owner and such other entities as Owner shall reasonably require from time to time as additional insureds. The foregoing insurance limits may be satisfied by any combination of primary and excess coverage.

Central to the parties' dispute is Provision 8(e) of the Agreement, which states:

Indemnification. Contractor agrees that it shall defend, indemnify, and hold harmless Owner, its respective direct and indirect parents and subsidiaries, any of its affiliated entities, successors and assigns and any current or future officer, director, employee, partner, member or agent of any of them ("Indemnitees") and the agents, officers and employees of all of the Indemnitees from and against any claims, liabilities, losses, damages, actions, causes of action, or suits to the extent caused by (A) any actual or alleged negligent or grossly negligent act or omission or willful misconduct of Contractor or its agents or employees at the Property or in connection with this Agreement or breach thereof in any way, (B) Contractor's failure to purchase and maintain all insurance required by this Agreement and (C) negligence or willful misconduct of Contractor or its agents or employees in any operation of a Security Vehicle under this Agreement. It is intended that all claims and demands, legal proceedings and lawsuits in which any party to this Agreement or additional insured under this Agreement is named or described as a defendant which alleges or describes any claim in which Contractor or a security officer has done or has failed to do any act or thing required pursuant to this Agreement or failed to provide the Services at the Property shall be a claim tendered to, accepted by or defended by Contractor. Owner shall within thirty (30) days after notice of any incident, potential claim or suit, or service of legal process, provide Contractor, at 1551 N Tustin Ave., Suite 650, Santa Ana, CA 92705 to the attention of Risk Department with written notice that an action has been brought and shall require Contractor, at its own expense, to employ such attorneys as Contractor may see fit to employ, and as reasonably approved by Owner's Director of Risk Management, to defend such claim or action on behalf of the Indemnitees. If a tender of defense and/or indemnity is refused by Contractor or its insurer, or if a defense is provided under any reservation of rights and Owner does not consent to such refusal or reservation of rights, Contractor shall pay liquidated damages in the sum of $2,000.00 to Owner for the amount of the added internal expense incurred by the Indemnitees in dealing

6

with the claim or action for which tender was refused or rights reserved. This liquidated damages provision shall be in addition to the Indemnitees' actual costs of defense, investigation, litigation, litigation management expenses for in-house counsel, costs of trial and/or settlement of the claim which are incurred by the Indemnitees which shall be billed to Contractor as incurred until the tender is accepted without reservation. The provisions of this paragraph shall survive the termination or expiration of this Agreement and shall not be construed to provide for any indemnification which would, as a result thereof, make the provisions of this paragraph void or to reduce or eliminate any other indemnification or right which the indemnified parties have by law.

The Agreement further provides in Paragraph L, "Attorney's Fees. If either party shall institute any action or proceeding against the other relating to the provisions of this Agreement, the unsuccessful party in the action or proceeding shall reimburse the prevailing party for all reasonable expenses and attorneys' fees and disbursements."

Based on the Agreement, TWM tendered its request for defense to Allied through two letters. Allied refused to defend TWM, so TWM filed a cross-claim against Allied for contribution and indemnity, breach of contract, and negligence. TWM also sought its attorney's fees.

A jury determined that the criminal actors who robbed Prater were solely responsible and found no negligence by any defendant. Before trial, the parties agreed to bifurcate and have a separate trial on TWM's cross-claim against Allied based on the contractual duty to defend. Given the jury's finding of no liability, the trial court ultimately determined that TWM's contribution and indemnity claim and

7

negligence claim against Allied were not viable. At issue in this appeal are the parties' competing motions for judgment based solely on the contractual duty to defend.

## MOTIONS FOR SUMMARY JUDGMENT

**Cross-Defendant [Allied's] Motion for Summary Judgment**

On January 24, 2024, Allied filed its Motion for Summary judgment. Allied supported its Motion for Summary Judgment with the following evidence: Prater's Original Petition; Prater's First Amended Original Petition; Prater's Second Amended Original Petition; Security Agreement between Allied and TWM; Charge of Court with Jury's Answers; and Affidavit of Mark Lapidus regarding attorney's fees.

In its Motion for Summary Judgment, Allied contends that because the jury found that no defendants, including Allied and TWM, were negligent, there were no available claims for contribution or indemnity. Additionally, Allied argues it had no contractual duty to defend TWM, because: (1) Prater asserted independent acts of negligence and premises liability against TWM; (2) Prater did not assert claims of vicarious liability or negligent supervision claims against TWM for Allied's acts or conduct; and (3) the jury found no liability on the part of Allied. Allied further claims, "Since the contract only required Allied to defend TWM if Allied (and not TWM) was negligent or breached the contract, no duty to defend was owed."

8

Allied notes that per the Agreement, Illinois law governs, and under Illinois law, Allied had no duty to defend or indemnify TWM and cites a portion of the Indemnification provision. Allied asserts that TWM brought claims for (1) contribution and indemnity under Texas Civil Practice and Remedies Code Chapter 32, (2) breach of contract, and (3) negligence, and given the jury's findings, the contribution and indemnity and negligence claims fail as a matter of law. As relevant to the duty to defend, Allied argues that in its cross-claim, TWM pleads that "[Allied] has contractual obligations to defend and indemnify Defendant/Cross-Plaintiff's allegations pursuant to the terms of the March 1, 2019, contract. [Allied] has refused to defend and indemnify Defendant/Cross-Plaintiff, and this refusal constitutes a material breach of the Agreement."

Allied asserts that under Illinois law, there is no duty to indemnify or defend one against his own negligence "unless such a construction is required by clear and explicit language in the contract or such intention is expressed in unequivocal terms." According to Allied, under the Agreement, this is "only 'to the extent caused by' any actual or alleged negligent conduct of [Allied] or its agents or employees." Therefore, Allied argues, based on Illinois law and the Agreement's limiting language, the defense obligation does not extend to the "indemnitee's own negligence or conduct." Additionally, Allied attempts to distinguish case law where courts determined indemnity and defense were owed by arguing those cases

9

involved broader contract language and that there are no claims of vicarious liability here. Further, it contends that the duty to defend TWM is predicated on negligence by Allied, and so the jury's finding that there was no negligence meant there was no duty to defend.

Finally, Allied argues that if it is successful in defending against TWM's breach of contract claim, then it is entitled to attorney's fees. In support of this argument, it points to the contract language and Lapidus's affidavit.

**Cross-Plaintiff [TWM's] Traditional Motion for Summary Judgment**

TWM also filed a Traditional Motion for Summary Judgment based on the Agreement. In support of its Motion for Summary Judgment, TWM attached the following evidence: Brookfield-Allied Security Agreement; Prater's Petitions; 2/16/21 Tender Correspondence to Allied; 5/13/21 Tender Correspondence to Allied; and Maron Marvel Invoices for Legal Services.

In its Motion, TWM argues, "Allied agreed to provide a defense for TWM in cases where there are allegations of negligent acts or omissions attributed to Allied within the scope of the Allied – TWM Security Agreement[.]" TWM asserts that it provided Allied with notice of Prater's allegations against Allied twice. Yet, Allied refused to defend TWM, which "amounted to a breach of contract." TWM claims that Allied's breach of contract harmed TWM, because TWM incurred reasonable and necessary litigation costs defending against Prater's allegations. According to

10

TWM, it "is entitled to recover its attorney fees from Allied as well as judgment in TWM's favor finding that Allied owes a duty to defend and to indemnify TWM from any liability alleged against TWM in this matter pursuant to the Allied – TWM Security Agreement." TWM then sets forth the facts supporting the breach of contract claim.

TWM characterizes the only two questions before the trial court as: "1) whether Allied had a duty to defend and indemnify TWM directly and through the procurement of required insurance; and 2) if there was a duty to defend, indemnify, and procure insurance, whether Allied has breached its duty to defend and to procure insurance to protect TWM." TWM contends that Allied had a duty to defend and indemnify TWM and cites to the plain language in the Agreement. Further, TWM asserts that the Agreement's language "indicates that Allied had a duty to defend TWM that was separate and independent of Allied's duty to indemnify" and cites Illinois law in support of this. TWM argues that Allied's receipt of notice of Prater's Original Petition triggered its duty to defend TWM. According to TWM, "There is no public policy in the state of Illinois against contracts that seek to allocate business risks as specified in the Allied-TWM Agreement." TWM argues that Allied breached its duty to defend without a good-faith basis.

Alternatively, TWM contends that Allied breached the Agreement by failing to procure the required insurance that would have provided for TWM's defense and

indemnity. Finally, TWM claims it is entitled to reasonable and necessary attorney's fees under the Agreement.

**Cross-Defendant [Allied's] Response in Opposition to Cross-Plaintiff's Motion for Summary Judgment**

On January 18, 2024, Allied filed its Response in Opposition to Cross-Plaintiff's Motion for Summary judgment. In support of its Response, Allied attached: the Affidavit of Mark Lapidus; Allied's Formal Tender Denial Letter; and TWM's First Supplemental Required Initial Disclosures.

In its response, Allied again argues the Agreement's language is not broad enough that it should have to defend and indemnify TWM for acts of TWM's own negligence, which were alleged here. Allied then attempts to distinguish Illinois case law cited by TWM in its Motion for Summary Judgment. Regarding TWM's allegation that the failure to name TWM as an additional insured constituted a breach of the Agreement, Allied responds that TWM's live pleading does not contain such a claim. Therefore, Allied objects to any claim that it failed to procure insurance as constituting a breach and contends the trial court should not consider any claim.

**Cross-Plaintiff [TWM's] Reply to [Allied's] Motion for Summary Judgment**

The same day that Allied filed its Response in Opposition, TWM filed its Reply to Allied's Motion for Summary Judgment. In its Reply, TWM differentiates between the duty to defend and the duty to indemnify and claims it is only seeking relief for Allied's failure to defend. TWM asserts that Allied had no good-faith basis

12

for its refusal to defend. TWM further argues the following: (1) under Illinois law, an indemnitor was found to have a duty to defend even though the only indemnitee was named as a defendant/alleged tortfeasor; (2) under Illinois law, the duty to indemnify is recognized as a separate duty than the duty to defend; (3) based on Prater's Petitions and the Agreement, Allied had no good-faith basis for its refusal to defend; and (4) the factual allegations in Prater's petitions amount to an allegation that Allied's negligence was the but for cause of her injuries.

**Trial Court's Final Judgment**

On January 21, 2024, the trial court signed its Final Judgment. In the Final Judgment, the trial court notes that given the jury's findings of no liability on the part of any Defendants, TWM's Chapter 32 claims for contribution and indemnity and its negligence claims "fail as a matter of law." The trial court adds that the only remaining claim is the breach of contract claim and that the Agreement contains a choice of law provision calling for the application of Illinois law. The trial court states that Illinois law is "virtually identical to Texas law on contract interpretation[,]" so the choice of law provision "does not make much of a difference in the Court's analysis." The trial court's judgment cites a portion of the indemnity provision and the elements for a breach of contract claim under Illinois law, which are the same as in Texas.

The trial court reasons that it was undisputed: Allied and TWM entered into the Agreement; TWM performed by paying for services and tendering the requisite demand required by the Agreement; Allied refused to defend; and TWM suffered monetary injury by having to provide its own defense. Thus, the trial court characterizes the only question before it as whether Allied had a duty to defend under the Agreement's express terms. The trial court also expressly states that although there was an issue of whether Allied maintained the proper insurance and named TWM as an additional insured, "it is of no moment" and "did not cause the damage TWM alleges and seeks here."

The trial court describes Prater's claims against all the Defendants as follows:

Defendants failed to appropriately train their employees and other staff to monitor security cameras present on the premises, to recognize known indications of potential criminal activity, to deter criminal activity and timely report perceived criminal activity; Defendants lacked adequate security policies and protocols based on industry best practices; Defendants failed to appropriately employ or otherwise provide appropriately trained security personnel to deter criminal activity, interrupt criminal activity as it occurred, or appropriately respond to criminal activity at the Mall and/or Dillard's; and, of greatest import here, Plaintiff specifically alleged that Defendants breached their duties to her by negligently hiring, training, retaining, supervising, and directing their employees, as well as by failing to provide adequate and proper security and by failing to formulate, have, and/or enforce adequate policies and procedures to prevent and/or deter criminal conduct at the Mall.

The trial court then concluded that the Agreement "very clearly puts the responsibility of all of these items on Allied[,]" except possibly the premises liability

14

claim, and the Agreement's express language "makes it clear that Allied should have defended TWM, despite the jury finding no merit in Plaintiff's claims." The trial court also differentiates between the duty to indemnify and duty to defend. The trial court responds to Allied's argument that under Illinois law, and while an indemnification agreement cannot be construed as indemnifying a party against its own negligence unless such construction "is required by clear and explicit language in the contract or such intention is expressed in unequivocal terms," that does not apply to the duty to defend.

The trial court then granted TWM's Motion for Summary Judgment and denied Allied's Motion for Summary Judgment. The trial court awarded TWM $72,246.80 in attorney's fees incurred for the defense and litigation expenses plus prejudgment interest, contingent attorney's fees if Allied unsuccessfully appeals, and post-judgment interest. Allied timely appealed.

## ISSUES ONE AND TWO:
## CONTRACT INTERPRETATION AND DUTY TO DEFEND

In issue one, Allied asks whether the first part of the Indemnification Provision required it to defend TWM, where it furnishes TWM a defense against claims caused by Allied's acts or omissions and the underlying plaintiff did not allege TWM is liable for any of Allied's acts or omissions. In issue two, Allied asks whether the second part of the Indemnification Provision required it to defend TWM where "(a) nothing in that part gives Allied a duty to defend; (b) by its plain language,

15

that part sets out what kinds of claims are eligible for tender and when the obligation to defend is invoked; and (c) to construe that part to require Allied to defend TWM would render a portion of the first part of the Provision superfluous." TWM responds that when reviewing the indemnity paragraph "in light of the contractual whole, Allied owed TWM a duty to defend."

**Standard of Review and Applicable Law**

Here, the Agreement contained a choice-of-law provision stating that Illinois law applies, which the parties do not dispute. When applying a contractual choice-of-law provision, we apply the substantive law of the choice-of-law provision but apply Texas law to procedural matters, including the standards of review. *See Autonation Direct.com, Inc. v. Thomas A. Moorehead, Inc.*, 278 S.W.3d 470, 472 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (explaining the substantive law of the chosen state may apply, we apply our own law to matters of remedy and procedure, including standards of review); *see also Credit Suisse AG v. Claymore Holdings, LLC*, 610 S.W.3d 808, 819 n.12 (Tex. 2020) (citation omitted) (noting same). We will apply Illinois contract interpretation principles, but we will employ the standard of review provided by Texas precedent. *See Credit Suisse AG*, 610 S.W.3d at 819 n.12; *Thomas A. Moorehead, Inc.*, 278 S.W.3d at 472.

We review a trial court's decision on a motion for summary judgment de novo. *See Wal-Mart Stores, Inc. v. Xerox State Loc. Sols., Inc.*, 663 S.W.3d 569, 576

16

(Tex. 2023). When the parties file competing motions for summary judgment, and the trial court grants one and denies the other, we review all questions presented and render the judgment that the trial court should have rendered. *See HCBeck, Ltd. v. Rice*, 284 S.W.3d 349, 352 (Tex. 2009) (citing *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004)). In reviewing all questions presented, we examine the parties' summary judgment evidence. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review the evidence in the light most favorable to the non-movant and party against whom the summary judgment was rendered. *See id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). "A traditional summary-judgment movant will prevail only by establishing that no material fact issue exists and it is entitled to judgment as a matter of law." *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 804 (Tex. 2023) (citations omitted); *see* Tex. R. Civ. P. 166a(c). If the movant meets his burden, "the burden then shifts to the non-movant to disprove or raise an issue of fact as to at least one of those elements." *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). If the movant does not meet its burden, "the burden does not shift, and the non-movant need not respond or present any evidence." *Id.* To be entitled to summary judgment on an affirmative defense, a defendant must plead and conclusively establish each

17

element of its defense as a matter of law. *Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 927 (Tex. 1996).

Illinois law provides that "[t]he interpretation of a contract is a question of law and therefore may be decided on a motion for summary judgment." *Joyce v. Mastri*, 371 Ill. App. 3d 64, 74, 308 Ill. Dec. 537, 861 N.E.2d 1102 (2007) (citation omitted). When interpreting a contract, we "consider the entire document to give effect to the parties' intent, as determined by the plain and ordinary meaning of the language of the contract." *Id.* (citation omitted). To ascertain this intent, "the various contract provisions must be viewed as a whole." *Lempa v. Finkel*, 278 Ill. App. 3d 417, 428, 215 Ill. Dec. 408, 663 N.E.2d 158 (1996) (citations omitted). "Words derive meaning from their context, and contracts must be viewed as a whole by examining each part in light of the other parts." *Id.* (citations omitted). Courts do not reject contract language as meaningless or surplusage, and they presume that a contract's terms and provisions "are purposely inserted and that the language was not employed idly." *Id.*

The Illinois Supreme Court has cautioned that it "'serves no useful purpose to attempt to analyze or reconcile the numerous cases interpreting indemnity clauses' since each individual case 'depends upon the particular language used and the factual setting of the case.'" *Buenz v. Frontline Transp. Co.*, 227 Ill. 2d 302, 310–11, 317 Ill. Dec. 645, 882 N.E.2d 525 (2008) (citing *Zadak v. Cannon*, 59 Ill.2d 118, 121,

18

319 N.E.2d 469 (1974)); *see also Wilda v. JLG Indus., Inc.*, 470 F. Supp. 3d 770, 784 (N.D. Ill. 2020) (citations omitted) (discussing Illinois law). In *Buenz*, the Illinois Supreme Court explained, "It is not simply the use of the phrase 'any and all' that determines whether a particular contract provides indemnification for an indemnitee's own negligence. The phrase must be read in the context of the entire contract." *See Buenz*, 227 Ill. 2d at 316, 317 Ill. Dec. at 653, 882 N.E.2d at 533. It noted that decisions resulting in no indemnification for the indemnitee's own negligence arose from contracts which "contained express clauses limiting indemnification to negligence occasioned by the indemnitor." *Id.* at 315–16, 317 Ill. Dec. at 653, 882 N.E.2d at 533. The court reasoned that for agreements containing such limiting language, "courts will not strain, simply because the contract also contains 'any and all' language, to read into that contract indemnification for an indemnitee's own negligence." *Id.* The court disavowed the proposition that its reasoning implied that "the inclusion of the phrase 'any and all' within an indemnification clause is insufficient to indemnify an indemnitee for its own negligence." *Id.* Ultimately, the court in *Buenz* determined that "any and all claims" absent any limiting language led the court to conclude that the agreement "clearly and explicitly provides indemnification for [indemnitee's] own negligence pursuant to the rest of the contract terms." *Id.* at 318.

19

Under Illinois law, the duty to defend is separate and distinct from the duty to indemnify, and the duty to defend is broader. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 125, 180 Ill. Dec. 691, 607 N.E.2d 1204, 1220 (1992) (discussing the distinction generally in the context of insurance). Further, Illinois courts do not apply the general rule placing a heightened duty-to-defend burden on insurers to all contracts to defend and will apply "a separate approach for analyzing the duty to defend in the buyer-seller context." *Medline Industries, Inc. v. Ram Medical, Inc.*, 892 F. Supp. 2d 957, 965 (N.D. Ill. 2012) (citing *Ervin v. Sears, Roebuck and Co.*, 469 N.E.2d 243, 127 Ill. App. 3d 982, 82 Ill. Dec. 709 (1984)).

**Analysis**

With these principles in mind, we turn to the contract. Allied advocates for an interpretation of the Indemnity provision that isolates certain portions of it in determining whether it had a duty to defend TWM under the Agreement. It urges this Court employ a strained reading that splits the Indemnity provision at issue into a "first part" and a "second part" with neither part used as context for the other. In doing so, it advocates for a meaning that is unmoored from the Agreement as a whole and from the broader context that would inform the parties' intent as expressed by the plain and ordinary language of the text. In contrast, TWM encourages us to look at the entire provision in the broader context of the Agreement as a whole. Under Illinois law, we believe the approach advocated by TWM in construing the

20

Agreement is correct. *See Joyce*, 371 Ill. App. 3d at 74, 308 Ill. Dec. at 545, 861 N.E.2d at 1110; *Lempa*, 278 Ill. App. 3d at 428, 215 Ill. Dec. at 416, 663 N.E.2d at 166. We now turn to the provision at issue, examining the plain and ordinary meaning of the language in the broader context of the entire Agreement.

First, Allied breaks the provision outlining the defense and indemnity requirements into two parts and would have us focus on "to the extent caused by" language alone. That said, these "parts" are not the entire provision. A careful reading of the provision shows that Allied agreed "that it shall defend . . . and hold harmless [TWM] . . .from and against any claims, liabilities, losses, damages, actions, causes of actions or suits to the extent caused by (A) any actual *or alleged* negligent or grossly negligent act or omission or willful misconduct of Contractor or its agents or employees at the Property or in connection with this Agreement or breach thereof in any way[.]" (Emphasis added.) This language specifies that Allied agreed to defend TWM against allegations of Allied's negligence at the property or in connection with the Agreement, which other provisions show was to procure security services. This language does not limit Allied's duty to defend against situations in which there were no allegations of negligence against TWM. Rather, the focus is on any allegations of negligence against Allied as the triggering mechanism to defend. Even considering the "to the extent caused by" language as limiting, when viewed in context it undercuts Allied's proposed reading. The duty

21

to defend is implicated since the claims, causes of action, or lawsuit at issue were allegedly caused by the negligent performance of certain responsibilities delegated to Allied under the contract.

Prater pleaded that all defendants, including Allied, were negligent in several respects, including failing to train their employees and staff "in the most basic security procedures[,]" to monitor security cameras, to recognize potential criminal activity, to deter criminal activity, and timely report criminal activity. She also alleged that they lacked adequate security policies and protocols and failed to appropriately employ appropriately trained personnel. These allegations arose from alleged failures which occurred at the property. While the provision is framed in the disjunctive, allegations of negligence against Allied "in connection" with the Agreement is an alternative way that the duty to defend may arise in the situation before us. "Connection" is defined as a "causal or logical relation or sequence" or "contextual relation or association." Meriam-Webster Online Dictionary, https://merriam-webster.com/dictionary/connection, last visited Jan. 29, 2026. Prater's claims could likewise be viewed as being "in connection with the Agreement," as they dealt with multiple alleged failures related to or associated with provision of security services, which was the Agreement's entire purpose.

Second, the defense and indemnity provision proceeds to express the parties' intent by stating:

22

> It is intended that all claims and demands, legal proceedings and lawsuits in which any party to this Agreement or additional insured under this Agreement is named or described as a defendant which alleges or describes any claim in which Contractor or a security officer has done or has failed to do any act or thing required pursuant to this Agreement or failed to provide the Services at the Property shall be a claim tendered to, accepted by or defended by Contractor.

Allied focuses on the disjunctive "or" in this last sentence to support its argument that it did not have to defend this claim – the claim need only have been tendered to it, and it was within its rights to reject the claim under the Agreement. We agree that the "or" is disjunctive. That said, focusing on this single "or" outside of the context of the Agreement as a whole makes the entire provision, along with many other provisions of the Agreement meaningless and mere surplusage, which we will not do. *See Lempa*, 278 Ill. App. 3d at 428, 215 Ill. Dec. at 416, 663 N.E.2d at 166. Allied urges us to construe this Agreement in such a way that it did not have a duty to defend because TWM was also named as a defendant with allegations of negligence against it. Importantly, this construction ignores language "that *all* claims and demands, legal proceedings and lawsuits in which *any party* to this Agreement . . . is named or described as a defendant[.]" The plain language of the defense and indemnity provision negates any reading that TWM's status as a named defendant or claims of negligence against it would be the determinative factor in its right to a defense from Allied.

This provision also requires Allied to pay TWM liquidated damages if Allied refuses a tender of defense or provides a defense under a reservation of rights that TWM does not consent to "for the amount of the added internal expense" TWM incurs "in dealing with the claim." The Agreement's plain language, read in context, shows that the parties intended to shift the cost of defending and dealing with such claims to Allied. The liquidated damages are in addition to the other costs of defense.

Third, the Agreement's other provisions provide additional context for the parties' intent that Allied has a duty to defend TWM in circumstances like the ones before us. Allied contends that Prater did not allege TWM was liable for Allied's acts or omissions under a theory of alter ego or vicarious liability. Allied focuses on what Prater fails to allege while ignoring what she does allege, including failures relating to the provision of security services and the training of security staff and which the Agreement shows was Allied's responsibility. The Agreement's language expressly states that Allied is responsible for training and providing security staff. The contract's requirement that Allied was to procure insurance naming TWM as an additional insured also informs this analysis, as it is yet another indication that the parties intended to shift the cost and risk related to security services from TWM to Allied.

Fourth and finally, Allied blurs the lines between the duties to defend and duties to indemnify. It advocates for strict construction of this "Indemnity provision"

24

as being one that requires indemnifying TWM for its own negligence in these circumstances. We disagree that this is such a provision. Rather, its particular language and the Agreement as a whole, along with the factual setting of this case, establishes that Allied is to defend and indemnify where the alleged acts of negligence or failures result from its provision of security services. *See Buenz*, 227 Ill. 2d at 310–11, 317 Ill. Dec. at 650, 882 N.E.2d at 530; *see also Wilda*, 470 F. Supp. 3d at 784. Under this contract, Allied is the party who bears the responsibility to provide those services.

Allied also cites *Dominick's Finer Foods, LLC v. Eurest Servs., Inc.*, No. 01-15-0369, 2015 IL App. (1st) 150369-U, 2015 WL 673491, at *7 (Ill. App. Ct. Nov. 2, 2015), for the proposition that it did not have the same heightened duty to defend as an insurance carrier. We agree that Illinois law treats non-insurers differently than insurers as it relates to a duty to defend. *See Ervin*, 469 N.E.2d at 249–50, 127 Ill. App. 3d at 990, 82 Ill. Dec. at 715–16 (explaining that insurance contracts are construed liberally in favor of the insured and insurance companies are not allowed to look behind allegations in complaint while non-insurers are entitled to investigate); *Medline Indus., Inc.*, 892 F. Supp. 2d at 965 (citation omitted) (same); *see also Dominick's Finer Foods*, 2015 WL 673491, at *7. That said, the heightened duty referenced requires an insurer to promptly defend without looking behind the allegations in a complaint, whereas a non-insurer may investigate a claim before

25

denying a tender. *See Ervin*, 469 N.E.2d at 249–50, 127 Ill. App. 3d at 990, 82 Ill. Dec. at 715–16; *Medline Indus., Inc.*, 892 F. Supp. 2d at 965; *see also Dominick's Finer Foods*, 2015 WL 673491, at *7. There are no allegations here by either party that Allied had a good-faith basis for denying the tender of defense because it needed time to investigate. Even so, the court in *Dominick's Finer Foods* determined that the contract "should be analyzed under ordinary contract principles." *Dominick's Finer Foods*, 2015 WL 673491, at *7. One notable distinction between this case and *Dominick's Finer Foods, LLC v. Eurest Services* is that case involved allegations of negligence arising from the owner's conduct of placing a mat down in a store, which was wholly unrelated to the provision of services under the contract. *See* 2015 WL 6735491, at *8. While Allied focuses on the "to the extent caused by" language in that case, Allied's argument is unpersuasive because the alleged acts of negligence here dealt with the provision of security services, which was Allied's responsibility under the contract.

Considering the entire Agreement and giving effect to the parties' intent, as determined by the plain and ordinary meaning of the contract language, we hold the trial court correctly interpreted the contractual provision as requiring Allied to defend TWM. *See Joyce*, 371 Ill. App. 3d at 74, 308 Ill. Dec. at 545, 861 N.E.2d at 1110; *Lempa*, 278 Ill. App. 3d at 428, 215 Ill. Dec. at 416, 663 N.E.2d at 166; *see*

26

*also Buenz*, 227 Ill. 2d at 310–11, 317 Ill. Dec. at 650, 882 N.E.2d at 530; *Wilda*, 470 F. Supp. 3d at 784. We overrule issues one and two.

## REMAINING ISSUES

Since an analysis of issues three through five depends on this Court determining that Allied did not have a duty to defend Allied, and we have already determined Allied did have such a duty, we need not reach Allied's remaining issues. *See* Tex. R. App. P. 47.1.

## CONCLUSION

Having overruled Allied's dispositive issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on October 16, 2025
Opinion Delivered February 12, 2026

Before Golemon, C.J., Wright and Chambers, JJ.